67 B.R. 557 (1986)
In the Matter of BEVILL, BRESLER & SCHULMAN ASSET MANAGEMENT CORPORATION, Debtor.
Saul S. COHEN, Trustee of Bevill, Bresler & Schulman Asset Management Corporation, Plaintiff,
v.
ARMY MORAL SUPPORT FUND: Bay Ridge Federal Savings & Loan; Broker's Capital; Bushnell Federal Savings & Loan; Champlain Valley Federal Savings & Loan; Chester Bank; Citizens Savings & Loan, Bellefontaine; Cross Country Federal Savings & Loan; Fidelity Savings & Loan, Berwyn, Illinois; First Federal Savings Bank; First Federal Savings & Loan, Freeport; First Federal Savings & Loan, Washington Court House; First National Bank of Elkhart; First National Bank of Skokie; First National Bank of Toms River; First Savings & Loan Association (Perth Amboy); Fort Lee Savings & Loan; Gibraltar Savings & Loan; Glen Ridge Savings & Loan; Government Employees Credit Union; Great American Federal Savings & Loan; Greenville Federal Savings & Loan; Harvest Home Savings & Loan; Hi-Plains Savings & Loan Association; Home Savings Association; Imperial Savings & Loan; Jefferson Building & Savings; Lesney Products Corp.; Lincoln Way Federal Savings & Loan; Mainland Savings & Loan; Mercer Savings & Loan Association; Merritt Commercial Savings & Loan; Midwest Government Securities; Niagara County Savings Bank; Newport National Bank of Providence; Old Borough Savings & Loan; Old Court Savings & Loan; Pennbank; Peoples Savings & Loan Assn.; Provident Savings & Loan; Prudential Federal Savings & Loan; Saranac Lake Federal Savings & Loan; Savers Bank; Savings Building & Loan; Security Savings & Loan; Seneca Federal Savings & Loan; Security Pacific Clearing & Services Corp.; Sentry Savings; Sewickley Savings & Loan Assn.; Southern Illinois Bank; United *558 Financial Savings Bank, F.S.B.; Universal Savings & Loan; Vernon Savings & Loan; Village Bank; First Federal Savings & Loan Assn. of Waterbury; General Trading Co., Inc.; Fidelity New York, F.A.; Wallkill Valley Federal Savings & Loan Assn.; First Federal Savings & Loan Assn. of Lincoln, Nebraska; Mutual Federal Savings & Loan Assn. of Sidney, Ohio; Morton Federal Savings & Loan; Odessa Savings Assn.; Calvert Insurance Company; Fairbanks Broadcasting Co., Inc.; Bradford Trust Company; Mona Williams; Westbury Savings & Loan; Worthen Bank & Trust Company, N.A.; Yonkers Savings Bank and Yorkridge Calvert Savings & Loan, Defendants.
In the Matter of BEVILL, BRESLER & SCHULMAN, INC., Debtor.
Richard W. HILL, Trustee for the Liquidation of Bevill, Bresler & Schulman, Inc., Plaintiff,
v.
FIDELITY NEW YORK, F.A., Champlain Valley Federal Savings & Loan Association; Worthen Bank & Trust Company, N.A.; Mainland Savings & Loan Association; City of Harrisburg, Pennsylvania; Maryland Savings-Share Insurance Corporation, as Conservator of Old Court Savings and Loan Inc.; and Security Pacific Clearing & Services Corporation, Defendants.
Civ. A. Nos. 85-1728, 85-2224, Adv. Nos. 85-2103, 85-5274.
United States District Court, D. New Jersey.
October 23, 1986.
*559 Ravin, Greenberg & Zackin by Jack M. Zackin, Gary N. Marks, Roseland, N.J., for Saul S. Cohen.
McCarter & English by Hayden Smith, Jr., Anne W. Crawford, John F. Brenner, Charles J. Benjamin, Newark, N.J., for Richard W. Hill.
Theodore H. Focht, Gen. Counsel, Securities Investor Protection Corp., by Michael E. Don, George F. Bingham, Washington, D.C.
Kirkpatrick & Lockhart by Joseph J. Brigati, Charles Lee Eisen, Douglas J. Scheidt, Washington, D.C., for Bayamon Federal Sav. & Loan Ass'n.
Rhoads & Sinon by Charles J. Ferry, Dean H. Dusinberre, Harrisburg, Pa., for City of Harrisburg, Pa.
Cowen, Liebowitz & Latman, P.C. by J. Christopher Jensen, New York City, for Federal Sav. & Loan Ins. Corp. as Receiver of Mainland Sav. Ass'n.
*560 Buckley, Kremer, O'Reilly, Pieper, Hoban & Marsh, Mineola, N.Y., for Fidelity N.Y., FSB.
Milbank, Tweed, Hadley & McCloy by Russell E. Brooks, Joseph S. Genova, Stephen J. Shimshak, New York City, for Huntington Sav. & Loan Ass'n.
Weil, Gotshal & Manges by Martin J. Bienenstock, Tonny K. Ho, Deryck A. Palmer, New York City, for Cuero Federal Sav. & Loan Ass'n.
William J. Scanlon Law Offices by Kathleen M. Scanlon, Fort Lee, N.J., for Fort Lee Sav. & Loan Ass'n.
Rose Law Firm, P.A. by Allen W. Bird, II, Michael R. Johns, Little Rock, Ark., and Scarpone & Edelson, P.C. by James A. Scarpone, Newark, N.J., for Worthen Bank & Trust Co. N.A.
Gaston, Snow, Beekman & Bogue by Catherine A. Ludden, New York City, for Sec. Pacific Clearing & Services Corp.
Wilkie, Farr & Gallagher by Roger D. Blanc, James J. Calder, William H. Rooney, New York City, for Prudential Federal Sav. & Loan Ass'n.
Kraft & Hughes by John B. Hall, Newark, N.J., and Ira Lee Sorkin, Regional Adm'r S.E.C. by Jason R. Gettinger, New York City.
Federal Reserve Bank of N.Y. by Mary Sue Sullivan, Andrew C. Harvard, New York City.
Cadwalader, Wickersham & Taft by Barry J. Dichter, H. Peter Haveles, Jr., Leslie R. Caldwell, Leonard J. Cali, New York City, for Official Committee of Reverse Repurchase Participants.
Carpenter, Bennett & Morrissey by Jerome E. Sharfman, Newark, N.J., and Okin, Pressler, Cohen & Hollander by Paul S. Hollander, Fort Lee, N.J., and Hahn & Hessen by Gilbert Backenroth, New York City, for Unofficial Committee of Repo Participants, Champlain Valley Federal Sav. & Loan Ass'n, First Federal Sav. & Loan Ass'n of Freeport, and Lesney Products Corp.
Hannoch Weisman by Ronald M. Sturtz, Arlene E. Mirsky, Roseland, N.J., for Official Creditors' Committee.
Clancy & Foster by Charles Clancy, East Orange, N.J., for Gibraltar Sav. & Loan Ass'n.
Gagliano, Tucci, Iadanza & Reisner by Ronald L. Reisner, West Long Branch, N.J., for East Jersey Sav. & Loan Ass'n.
Porter, Wright, Morris & Arthur by H. Grant Stephenson, Columbus, Ohio, for Connie J. Harris, Successor-in-Interest to Jefferson Bldg. & Sav. Co.

 TABLE OF CONTENTS
 I. INTRODUCTION
 II. PROCEDURAL BACKGROUND
 III. FACTUAL BACKGROUND
 A. The Debtors
 B. Repos and the Repo Market
 C. The Test Cases
 1. Overview
 2. The AMC Test Case Transactions
 a. GNMA Pool #69692
 b. GNMA Pool #61337
 c. U.S. Treasury Notes, 11.125%
 d. GNMA Pool #40566
 e. GNMA Pool #57318
 3. The BBS, Inc. Test Case Transactions
 a. GNMA Pool #47448
*561
 b. GNMA Pool #63571
 c. FHLB, Cusip #31388MX5
 d. U.S. Treasury Bills, Cusip #912794HQ0
 IV. ISSUES
 V. DISCUSSION
 A. Legal Characterization of Repo and Reverse Repo Transactions
 1. Contentions of the Parties
 2. Applicable Law
 3. Express Terms of Repo and Reverse Repo Agreements
 4. Extrinsic Evidence of Intent
 a. Books and Records of the Parties
 b. Accounting Conventions
 c. Regulatory Treatment
 d. Trade Custom and Usage
 5. Decisional Law
 a. Tax Cases
 b. Securities Fraud Cases
 c. Bankruptcy Cases
 6. Conclusion
 B. Customer Status under SIPA
 C. Treatment of Reverse Repo Agreements
 D. Delivery/Transfer of Securities to AMC Repo Participants
 1. Section 8-313(1)(a) of the N.Y.U.C.C. and N.J.U.C.C.
 2. N.J.U.C.C. § 12A:8-313(1)(e) and N.Y.U.C.C. § 8-313(1)(g)
 3. N.J.U.C.C. § 12A:8-313(1)(d)
 4. N.J.U.C.C. § 12A:8-313(1)(c) and N.Y.U.C.C. § 8-313(1)(d)
 5. Conclusions as to Deliver/Transfer
 a. Certificated and Book-Entry Securities in the AMC Clearing
 Account
 b. Certificated Securities in the AMC Safekeeping Account
 c. Book-Entry Securities in the AMC Safekeeping Account
 E. Imposition of Constructive Trusts over Securities in the AMC Clearing
 Account
 VI. CONCLUSIONS
 GROSSARY OF ABBREVIATIONS
 AMC - Bevill, Bresler & Schulman Asset Management Corporation
 Bayamon - Bayamon Federal Savings & Loan Association of Puerto Rico
 BBS, Inc. - Bevill, Bresler & Schulman, Inc.
 Bradford - Bradford Trust Company
 Champlain - Champlain Valley Federal Savings & Loan Association of Plattsburgh
 Clearing Agreement - Clearing, Custody and Financing Agreement
 The Code - The Bankruptcy Code, 11 U.S.C. § 101, et seq.
 Cuero - Cuero Federal Savings & Loan Association
*562
 Dauphin - County of Dauphin, Pennsylvania
 Dominion - Dominion Bank, N.A.
 FHLB - Federal Home Loan Bank Board
 Fidelity - Fidelity New York, F.A.
 FRBNY - Federal Reserve Bank of New York
 Freeport - First Federal Savings & Loan Association of Freeport
 GAAP - generally accepted accounting principles
 GNMA - Government National Mortgage Association
 Hamilton - Hamilton Bank
 Harrisburg - City of Harrisburg, Pennsylvania
 Huntington - Huntington Savings & Loan Association
 Lesney - Lesney Products Corp.
 Mainland - Mainland Savings & Loan Association
 Merritt - Merritt Commercial Savings & Loan Association
 NASD - National Association of Securities Dealers, Inc.
 N.J.U.C.C. - Uniform Commercial Code of New Jersey, N.J.S.A. 12A:1-101, et seq.
 N.Y.U.C.C. - Uniform Commercial Code of New York, N.Y Consolidated Laws,
 Uniform Commercial Code § 1-101, et seq. (McKinney Supp. 1986)
 Perth Amboy - First Savings & Loan of Perth Amboy
 PSA - Public Securities Association
 Prudential - Prudential Federal Savings & Loan Association
 Repo - Repurchase transaction in government or agency securities
 Repo Committee - Unofficial Committee of Repurchase Participants
 Repo participant - Participant in repurchase transaction with AMC or BBS, Inc.
 Reverse repo - Reverse repurchase transaction in government or agency securities
 Reverse Repo Committee - Official Committee of Reverse Repurchase Participants
 Reverse repo participant - Participant in reverse repurchase transaction with AMC
 or BBS, Inc.
 SEC - Securities and Exchange Commission
 SIPA - Securities Investor Protection Act
 SIPC - Securities Investor Protection Corporation
 SPCSC - Security Pacific Clearing and Services Corporation
 SPEED - Security Pacific Easy Electronic Delivery
 SPNTCo. - Security Pacific National Trust Co.
 Universal - Universal Savings & Loan Association
 Worthen - Worthen Bank & Trust Company, N.A.

DEBEVOISE, District Judge.
I. INTRODUCTION
Motions and cross-motions for summary judgment or partial summary judgment have been filed in two separate adversary proceedings: one instituted in the proceeding for the liquidation of Bevill, Bresler & Schulman, Inc. ("BBS, Inc.") pursuant to the Securities Investor Protection Act ("SIPA"), 15 U.S.C. § 78aaa, et seq., and the other instituted in the proceeding for reorganization of Bevill, Bresler & Schulman Asset Management Corporation ("AMC") under Chapter 11 of the Bankruptcy Code ("the Code"), 11 U.S.C. § 101, et seq. The BBS, Inc. Trustee moves for *563 summary judgment or partial summary judgment with regard to four series of securities transactions involving BBS Inc. which have been designated as `test cases' in the BBS, Inc. liquidation proceeding. The AMC Trustee similarly moves for partial summary judgment with regard to five such `test cases' in the AMC reorganization proceeding. The unofficial Committee of Repurchase Participants (the "Repo Committee"), Champlain Valley Federal Savings & Loan Association of Plattsburgh ("Champlain"), First Federal Savings & Loan Association of Freeport ("Freeport") and Lesney Products Corp. ("Lesney") (hereinafter collectively referred to as the "Repo Committee") jointly cross-move for summary judgment on behalf of participants in repurchase transactions with BBS, Inc. and/or AMC. The City of Harrisburg, Pennsylvania ("Harrisburg"), also cross-moves for summary judgment in the adversary proceeding initiated by the BBS, Inc. Trustee. Due to the similarity of the issues and competing claims involved in the test cases, the hearings on the motions and cross-motions were consolidated, and this opinion sets forth the decision with regard to all of them.
II. PROCEDURAL BACKGROUND
On April 7, 1985, AMC filed a voluntary petition for reorganization under Chapter 11 of the Bankruptcy Code. On application of the Securities and Exchange Commission ("SEC") made on April 8, 1985, AMC's Chapter 11 case was withdrawn from the Bankruptcy Court to the District Court pursuant to 28 U.S.C. § 157(d). On April 9, 1985, Saul S. Cohen, Esq., was appointed Chapter 11 Trustee of AMC. On April 10, 1985, Mr. Cohen was also appointed equity receiver of AMC's parent corporation and one other related corporation.
On April 8, 1985, the SEC filed a verified complaint against BBS, Inc., AMC, the five principals of BBS, Inc. and AMC, and other related corporations and partnerships owned or controlled directly or indirectly by the principals. The complaint alleged securities fraud in violation of the Securities Act of 1933 and the Securities and Exchange Act of 1934. Richard W. Hill, Esq., was appointed Temporary Receiver of BBS, Inc. and three related corporations in the SEC action on April 10, 1985. An involuntary petition in bankruptcy was filed against BBS, Inc. on May 2, 1985. On May 6, 1985, the Securities Investor Protection Corporation ("SIPC") filed an application for a protective decree pursuant to 15 U.S.C. § 78eee. On May 8, 1985 an order was entered adjudicating the customers of BBS, Inc. to be in need of protection under SIPA, and Mr. Hill was appointed Trustee for the SIPA liquidation of BBS, Inc.
On May 3, 1985 the AMC Trustee commenced the above adversary proceeding in the AMC reorganization proceeding, naming all known creditors of AMC as defendants. The complaint seeks a judgment "determining the extent, validity and priority of the liens, ownership interests or other legal interests of the defendants in and to assets of the estate including government securities in the possession, control or custody of the Trustee and/or subject to repurchase agreements with the debtor." Status conferences in both the AMC reorganization and BBS, Inc. liquidation proceedings were jointly held on September 4, 1985 and October 15, 1985 for the purpose of (1) identifying certain categories of securities transactions in which the debtors were engaged which raise legal issues common to the claims of particular classes of creditors, and (2) selecting representative securities transactions within each category as `test cases' which would be litigated on an expedited basis. The AMC Trustee in consultation with the official and unofficial creditors' committees selected five such transactions to serve as test cases within the omnibus adversary proceeding brought by the Trustee.
On November 7, 1985, the BBS, Inc. Trustee commenced the above adversary proceeding in the BBS, Inc. liquidation proceeding. The Trustee's complaint seeks a declaratory judgment defining the rights and interests of various parties who were involved in five `test case' securities transactions with BBS, Inc.
*564 The AMC Trustee moves for summary judgment: (1) authorizing the Trustee to reject the reverse repurchase agreements respecting the securities underlying the `test case' transactions pursuant to 11 U.S.C. § 365(a); (2) adjudging that the securities are property of the estate within the meaning of 11 U.S.C. § 541; and (3) declaring that those parties to the test cases who engaged in repurchase and reverse repurchase transactions with AMC ("repo participants" and "reverse repo participants") are general creditors of the estate with no ownership or other legal interest in or to the test case securities or their proceeds. In support of his motion the AMC Trustee has submitted: (1) the affidavit of Larry Dean Pugh, a government securities trader and market consultant to the Trustee, in which he describes the industry practices of dealers in government securities with regard to the transfer and/or use of securities which are acquired pursuant to reverse repurchase agreements ("reverse repos"); (2) five separate affidavits of Henry Green, a consultant to the Trustee retained to assist him in reconstructing the books and records of AMC, in which he describes the documentation available to the Trustee relating to the repurchase transactions ("repos") and reverse repos which are the subject of each of the five test cases in the AMC adversary proceeding: (3) the affidavit of Joseph Guardino, submitted on behalf of Security Pacific Clearing and Services Corporation ("SPCSC"), in which he summarizes the clearing and safekeeping functions performed by SPCSC for securities dealers such as BBS, Inc. and AMC, and describes SPCSC's usual operating procedures, generation of documents and document flow in transactions like those at issue in the test cases; (4) the affidavit of Charles M. Viviano, Managing Director and Chief Executive Officer of SPCSC, in which he incorporates a statement presented to the Commerce, Consumer and Monetary Affairs Subcommittee of the House Committee on Government Operations describing in general terms the financing, clearing and safekeeping functions performed by SPCSC pursuant to its contracts with securities dealers; and (5) the affidavit of Robert J. Franz, a Manager with the accounting firm of Laventhol & Horwath.
The BBS, Inc. Trustee similarly moves for summary judgment in favor of the Trustee with respect to four of the five test cases covered in his complaint, or, in the alternative, for partial summary judgment declaring that: (1) the repos and reverse repos involved in the test case transactions are collateralized loans and not purchases and sales; (2) repo participants and reverse repo participants in the test cases are not customers of BBS, Inc. within the terms of SIPA; (3) repo participants who did not take actual possession of the underlying securities neither perfected their interests in the securities under New Jersey law nor acquired any interest under New York law; (4) the Trustee's rights to the securities underlying the reverse repos are superior to those of the reverse repo participants; and (5) the Trustee's rights to the proceeds remitted to him pursuant to 11 U.S.C. § 559 are superior to those of the reverse repo participants.
In support of his motion, the BBS, Inc. Trustee has submitted: (1) the reports of Marcia Stigum and Robert Geiger, who were retained by the Trustee as experts on the subject of the repo market in government and agency securities, in which they set forth their views of the economic substance of repo transactions and the proper characterization of such transactions; (2) two affidavits of Roger M. Landon, a past Assistant Manager of Operations for BBS, Inc. and a Vice-President at the time of its collapse, in the first of which he reviews the existing documentation relating to the repos and reverse repos underlying the four test cases which are the subject of the Trustee's present motion, and in the second of which he sets forth facts relating to instances in which BBS, Inc. made substitutions of securities subject to both possessory and non-possessory repo transactions; (3) the report of Raymond E. Perry of the accounting firm of Touche Ross & Co. regarding current accounting practices in accordance *565 with generally accepted accounting principles for repos and reverse repos by broker/dealers, commercial banks, savings and loan associations, mortgage bankers and state and local government entities; (4) the report of John L. Manley also of Touche Ross & Co. which addresses the accounting treatment of repos and reverse repos in the certified financial statements and books and records of BBS, Inc.; and (5) the affidavit of Dianne M. Boitz of Touche Ross & Co. which supplements the information and documentation contained in the Landon affidavit.
The Repo Committee cross-moves in both the AMC and BBS, Inc. adversary proceedings for summary judgment: (1) declaring that repo participants are customers under the terms of SIPA; (2) declaring that repo participants have, pursuant to either New York or New Jersey law, effectuated transfer or delivery of the securities underlying the repo transactions at issue in the test cases, or, in the alternative, perfected security interests in the securities; and (3) imposing a constructive trust on the securities claimed by Champlain and Freeport. In support of its cross-motion, the Repo Committee has submitted the affidavit of Clifford H. Goldman, Executive Vice President of Lehman Government Securities, Inc., in which he incorporates his written report to the Trustee which describes the nature and size of the repo market, the mechanics of repo transactions and custodial arrangements for the safekeeping of securities involved in such transactions, and the importance of the repo market as a mechanism for financing the national debt, implementing monetary policy and stimulating investment in the domestic housing market, and sets forth his opinions with regard to the proper economic characterization of repo transactions.
Harrisburg cross-moves for summary judgment declaring that it is a customer of BBS, Inc., within the terms of SIPA, and has submitted in support of its cross-motion the report of William J. Rafferty, a Partner in the accounting firm of KMG Main Hurdman, in which he describes the accounting treatment of repos and reverse repos by state and local governments.
The Federal Reserve Bank of New York ("FRBNY") has submitted a memorandum of law as amicus curiae accompanied by (1) the affidavit of Peter D. Sternlight, Executive Vice President of FRBNY, in which he describes the role of the repo market as a vehicle for financing the national debt and adjusting the level of bank reserves in order to achieve monetary policy goals, stresses the importance of maintaining liquidity and flexibility in the market for government securities, and expresses his view regarding the proper characterization of repo transactions, and (2) the affidavit of Daniel C. Bolwell, Chief of the Securities Transfer Department of the FRBNY, in which he sets forth the minimum denominations of the Federal Home Loan Bank Board security and the two Treasury debt securities involved in the test cases.
SIPC has submitted papers in the BBS, Inc., adversary proceeding in support of the Trustee's summary judgment motion.
The Official Committee of Reverse Repurchase Participants in the AMC reorganization proceeding (the "Reverse Repo Committee") has submitted papers on behalf of reverse repo participants in opposition to the AMC Trustee's motion for partial summary judgment and the Repo Committee's cross-motion for summary judgment, and papers as amicus curiae in the BBS, Inc. proceeding in partial opposition to the BBS, Inc. Trustee's motion. In support of its position, the Reverse Repo Committee has submitted: (1) separate affidavits of representatives of the five reverse repo defendants in the AMC test cases setting forth their respective purposes in entering reverse repos with AMC, their understandings with regard to the nature and substance of the reverse repos to which they were a party, and their bookkeeping and accounting treatment of reverse repos; (2) the affidavit of Michael S. Huber, a Partner in the accounting firm of KMG Main Hurdman, in which he incorporates his report to the Committee regarding generally *566 accepted accounting principles ("GAAP") applicable to repo transactions and the accounting treatment accorded such transactions by AMC; (3) the affidavit of David I. Meiselman, Professor of Economics and Director of the Graduate Economics Program at Virginia Polytechnic Institute and State University, in which he incorporates his report to the Committee on the economic substance of repos and reverse repos; and (4) the affidavit of H. Peter Haveles, Jr., Esq., pursuant to Fed. R.Civ.P. 56(f) in which he asserts that additional discovery is necessary before the Committee can present facts essential to its opposition to the AMC Trustee's motion for partial summary judgment.
Worthen Bank & Trust Company, N.A. ("Worthen") and Prudential Federal Savings & Loan Association ("Prudential") have filed papers in opposition to the summary judgment motions of both Trustees. Cuero Federal Savings & Loan Association ("Cuero") opposes the motion of the AMC Trustee for summary judgment. Fidelity New York, F.A. ("Fidelity"), Bayamon Federal Savings & Loan Association of Puerto Rico ("Bayamon") and Huntington Savings & Loan Association ("Huntington") have each submitted papers in the BBS, Inc. proceeding in opposition to the Trustee's motion.
III. FACTUAL BACKGROUND
A. The Debtors
BBS, Inc., a New Jersey corporation, was a securities broker-dealer registered with the SEC under the Securities and Exchange Act of 1934 and a member of SIPC and the National Association of Securities Dealers, Inc. ("NASD"). BBS, Inc., maintained its principal corporate offices in Livingston, New Jersey, and, as of April 8, 1985, also maintained offices in New York City, Houston, Texas, and Palm Beach and Fort Lauderdale, Florida. Trading activities were conducted at each location. Landon Dep. at p. 17, 11.20-21. BBS, Inc., also maintained a vault at 100 William Street in New York City out of which it conducted certain in-house securities functions, principally involving municipal securities. Id. at p. 18, 11.5-20. Prior to the appointment of Mr. Hill as Temporary Receiver, BBS, Inc. engaged in a variety of securities and related financial transactions with and on behalf of its customers. Its customers included individual retail customers and various institutional investors such as municipal authorities, commercial banks, and savings and loan associations. A large part of BBS, Inc.'s business involved financial transactions with government securities â either outright sales and purchases, or transfers made pursuant to repo and reverse repo transactions.
AMC, also a New Jersey corporation, was an unregulated secondary dealer in government securities. It was neither registered with the SEC, nor a member of SIPC or NASD. AMC is a corporate affiliate of BBS, Inc. The parent corporations of both AMC and BBS, Inc. were owned by the same five individual principals. Both corporations operated out of the same offices in Livingston, New Jersey. AMC had no employees of its own but utilized the staff of BBS, Inc. to effectuate trades. Id. at p. 23-24. Whether a particular trade was processed through AMC or BBS, Inc. depended principally upon which corporation had possession of, control over or access to the particular securities. Id. at p. 28, 11.22-25. Unlike BBS, Inc. which offered a full panoply of investment services to its customers, AMC was engaged primarily in the trading of government securities through repo and reverse repo transactions.
B. Repos and the Repo Market
Each of the present test cases involves competing claims of ownership or entitlement to securities (or the proceeds of the sale thereof) utilized in repo or reverse repo transactions between the debtors and the individual defendants. A standard repo consists of a two-part transaction. The first part consists of the transfer of specified securities by one party, the seller, to another party, the buyer, in exchange for cash. The second part consists of the contemporaneous *567 agreement by the seller to repurchase the securities at the original price, plus an agreed upon amount of interest, on a specified future date. The amount of the original repo price is typically less than the prevailing market value of the securities. This differential is sometimes referred to in the trade as the "hair-cut." Meiselman Rep., para. 3(b) at p. 2. The repurchase price paid at the maturity date of the repo agreement consists of the original purchase price amount plus interest calculated at a predetermined rate from the original trade date to the maturity date of the repo transaction. The interest paid at the maturity date of the repo agreement does not bear any relationship to the interest rate or yield paid on the underlying security, but rather is based on the prevailing market rate paid on investments or financing transactions of similar maturity and risk. Meiselman Rep., para. 3(c) at p. 3. A standard reverse repo consists of the same two-part transaction viewed from the perspective of the buyer. Thus, when one sells a security and agrees to buy it back he is engaged in a repo transaction. When the same party buys a security and agrees to sell it back, he is engaged in a reverse repo transaction.
The terms "repo" and "reverse repo" will be used in this opinion to describe the transactions from the perspective of the bankrupt dealers. That is, in their repo transactions, AMC and BBS, Inc. (as seller) "repoed out" securities to repo participants (as buyers) and simultaneously agreed to repurchase the securities on future dates. Conversely, in their reverse repo transactions, securities were "reversed in" to AMC and BBS, Inc. (the buyers) from reverse repo participants (the sellers) who agreed to repurchase the securities on the maturity date of the reverse repo agreements.
The repo market in government and agency securities performs several vital functions in the nation's economy. The United States Treasury relies heavily on the repo market as a tool for financing the national debt at the lowest possible cost. Sternlight Affidavit, para. 7 at p. 4. New issues of Treasury debt securities in the form of short-term Treasury Bills (obligations with a maturity of up to a year), medium-term Notes (obligations with a maturity of one to ten years) and long-term Bonds (obligations with a maturity of more than 10 years) are initially offered to approximately 36 primary dealers at auction. As the national debt has grown, Treasury auctions have become more frequent and of greater size. The amount of securities purchased by primary dealers at any one Treasury auction often aggregates in the tens of billions of dollars. Goldman Rep. at p. 8. The primary dealers themselves do not have the funds required for the outright purchase of these securities at auction. Nor are commercial banks capable of providing the amount of funds needed by primary dealers to purchase the huge amounts of Treasury securities sold at auction. In addition, to the extent that primary dealers must resort to bank loans to finance their securities purchases, the cost associated with this borrowing would be higher, the amounts they are willing to bid for Treasury securities will be lower, and the interest rates for Treasury securities will necessarily be higher. Goldman Rep. at 9. As an alternative to commercial bank loans, primary dealers have relied heavily on temporary financing through repo transactions with secondary dealers such as BBS, Inc. and AMC and institutional customers pending resale of the issues to other investors. Sternlight Aff., para. 6 at p. 3.
The repo market has also proven to be a highly effective and flexible short-term tool for the execution of monetary policy by the Federal Reserve system. The Federal Open Market Committee makes extensive use of repos and reverse repos in regulating the level of bank reserves. Goldman Rep. at 10. In order to smooth seasonal or unexpected fluctuations in the monetary supply, which in turn causes short-term fluctuations in interest rates and the rate of inflation, the Federal Reserve will engage in reverse repo transactions as a buyer to increase bank reserves or initiate repo transactions as a seller to decrease bank *568 reserves. Stigum Rep. at 14. During 1985, the Federal Reserve entered the repo market approximately 150 times. Goldman Rep. at 10. Federal Reserve operations in the market on a single day through repo or reverse repo transaction often came to $3-4 billion and have reached as high as $7.9 billion. Sternlight Aff. para. 4, p. 3.
The repo market also contributes to a strong domestic housing market by enhancing the liquidity of mortgage-backed securities insured by government sponsored agencies such as the Government National Mortgage Association ("GNMA") (referred to generically as "agency securities"). Any market disruptions which restricted the liquidity of these securities would increase the yield needed to attract investors, and, as a result, mortgage lending institutions would be forced to charge higher interest rates on consumer mortgages. Goldman Rep. at 12.
The ability to tailor the maturity of repos and to vary amounts invested from day to day make them especially suitable to the investment needs of entities experiencing seasonal and unpredictable cash flows. The short-term yield, liquidity and flexibility of repo transactions combined with the meteoric increases in the federal debt have led to dramatic increases in the daily volume of repo trades. Repo and reverse repo transactions by primary dealers alone are estimated to aggregate more than $300 billion daily. In contrast, the average daily value of shares traded on the New York Stock Exchange and American Stock Exchange combined is approximately $12 billion. Goldman Rep. at 7.
As alluded to above, participants in the repo market fall into three broad categories: primary dealers, secondary dealers and institutional customers. The 36 primary dealers are selected by the Federal Reserve to distribute new issues of Treasury debt and act as "market-makers" for government securities. They generally enter major transactions with large institutional investors. The FRBNY monitors the activity and financial soundness of primary dealers through on site visits and required daily, monthly and annual reports setting forth their transactions, positions and capital. Goldman Rep. at 12.
There are estimated to be approximately 200 secondary government securities dealers. These secondary dealers do not deal directly with the Federal Reserve. Id. at 13. BBS, Inc. and AMC were secondary dealers. Savings and loan associations and state and local governments make up a significant portion of customers engaging in repo transactions with secondary dealers. Government securities investors in the secondary repo market also include money market and mutual funds, pension funds, insurance, financial and other corporations, and foreign investors.
The securities involved in repo and reverse repo transactions are of two types: certificated securities and book entry securities. Certain mortgage-backed securities guaranteed by such agencies as GNMA are issued in the form of tangible paper certificates. The certificates generally represent an interest in a specific pool of government insured or guaranteed mortgages. These securities are typically referred to as "pass through" securities in that the holder of a certificate is entitled to direct payment of his/her share of principal and interest paid on the underlying mortgages in a given pool. Six of the nine securities at issue in the present test cases are certificated GNMA securities.
Book-entry securities, on the other hand, are uncertificated securities which are recorded as messages or data stored in a computer. Book-entry securities are maintained through the Federal Reserve book-entry system.[1] Within this system, each Federal Reserve Bank establishes and maintains book-entry accounts for "depository *569 institutions," within its district. Pursuant to 12 U.S.C. § 461, eligibility to maintain a direct account at a Federal Reserve Bank is limited to institutions which are eligible for federal deposit insurance, including commercial banks, trust companies, savings banks, savings and loan associations and credit unions. There is no corresponding restriction on the individuals and entities that may maintain book-entry accounts at depository institutions.
The Federal Reserve book-entry system involves a tiered system of accounts. Interests of a depository institution in book-entry securities are recorded on the books of a Reserve Bank, and interests of the customers of the depository institution are recorded on the books of that institution. The depository institution acquires control over disposition of the securities in its book entry accounts at a Federal Reserve Bank, as well as the right to receive principal and interest payments. The depository institution in turn is accountable to its customers for both the securities and payments it receives. If a customer of a depository institution is another bank, or a securities dealer, the bank or securities dealer may also maintain book-entry accounts for its customers, based on the securities maintained for it by the depository institution.
Book entry securities are transferred through a computer network, called "Fedwire," which connects the 12 Federal Reserve Banks (and their branch banks) with the depository institutions. In processing a book-entry transfer transaction, a Reserve Bank makes up to four entries on the securities and reserve accounts of depository institutions. If securities are transferred "free," the Reserve Bank debits the securities account of the sending depository institution and credits the securities account of the receiving depository institution in the aggregate principal amount specified in the transfer instruction transmitted by the sending institution. If the securities are transferred against payment, the Reserve Bank also credits the reserve account of the sending depository institution and debits the reserve account of the receiving depository institution in the dollar amount specified in the instruction. In turn, the depository institutions "are expected to maintain appropriate records in regard to their customers, covering such matters as transfer of the securities, pledge interests in the securities, and redemption of the securities and payment of interest thereon." Operating circular ("O.C.") No. 21 of the FRBNY, para. 3(c).
The majority of all Treasury debt securities are now issued in book-entry form. Certain mortgage-backed "agency" securities such as those guaranteed by the Federal Home Loan Bank Board ("FHLB") are also issued in book entry form and transferred over the Fedwire. Of the nine securities at issue in these test cases, two are Treasury debt securities and one is an FHLB security.
Government and agency issued securities are exempt from the registration and periodic reporting requirements of the federal securities laws. Similarly, firms that deal only in government or other exempt securities are free from comprehensive oversight or regulation, and there presently are no uniform or comprehensive margin or capital requirements with which such dealers must comply. See, e.g., Federal Reserve Bank of Atlanta, Economic Review, Sep. 1985, p. 7; Regulation of the Government Securities Market: Report by the SEC to the Subcommittee on Telecommunications, Consumer Protection and Finance of the House Committee on Energy and Commerce, June 20, 1985, Exhibit 1, p. 11 (Goldman Rep., Exhibit D). Often such dealers are thinly capitalized and their securities inventories are highly leveraged. Goldman Rep. at pp. 28-29; FRB of Atlanta, Economic Review, Sept. 1985, p. 7.
Secondary dealers in government securities generally do not have available cash from working capital or unsecured borrowings to cover the size of most reverse repurchase transactions. Instead, they finance reverse repo transactions with cash obtained by "repoing out" or selling outright the securities they receive under reverse repo agreements. It is for this reason *570 that reverse repo agreements customarily contain no restrictions on the dealer's right to transfer or encumber the securities obtained through reverse repo transactions. Pugh Aff., śś 4-5.
As a matter of custom and usage in the industry, securities dealers such as AMC and BBS, Inc. do not ordinarily hold securities acquired through a reverse repo agreement to the maturity date of the reverse repo. Securities may be and are in practice often transferred by the dealer to a repo customer or another dealer who may in turn transfer them to its own repo customer. There is theoretically no limit on the number of repo transactions to which a security may become subject after it is acquired by a dealer under a reverse repo transaction. Each subsequent repo party may take physical possession of the security, so that the dealer's original reverse repo customer will in the customary transaction be totally unaware of the physical location of the securities or the existence and terms of the subsequent transactions to which the security is subject. In practical effect, the reverse repo participant relinquishes to the dealer all control over the security during the term of the reverse repo agreement. Pugh Aff., ś 5; Goldman Rep. at 28-29. The dealer is obligated only to return the security or, if fungible, a security of equivalent value upon the maturity date of the reverse repo agreement. Goldman Rep. at 28.
There are generally two types of possible custodial arrangements involved in typical repo transactions: possessory or delivery repo transactions and non-possessory or safekeeping repo transactions.
In a delivery repo transaction, the dealer transfers the securities to the repo participant or its agent at the outset of the transaction. Certificated securities are physically delivered by the dealer or its agent to the repo participant or its agent. Book-entry securities are wired against simultaneous payment between the book-entry accounts of the depository institutions where the dealer and the repo participant maintain their respective book-entry accounts. In either case, the delivery of securities necessarily entails certain transfer costs. See generally, Goldman Rep., pp. 17-19, 31-32.
In a non-possessory repo transaction, the dealer retains the securities for the account of the repo participant. The non-possessory repo is an attractive alternative to the delivery repo for a number of reasons. Delivery of securities may be impractical given the difficulty in effecting transfer quickly enough to accommodate the short settlement periods of many repo transactions. In addition, the parties may wish to avoid the transaction costs associated with delivery. Id.
Under non-possessory repo transactions, dealers frequently do not physically retain the securities. Many dealers utilize the services of clearing entities to facilitate the movement of securities and funds involved in the processing of repurchase transactions. The services provided government securities dealers by such clearing firms include the receipt and delivery of securities, payment for securities, and collection or transfer of funds for securities sold. These transactions are accomplished through an account maintained by the clearing firms for each of their dealer customers ("clearing accounts"). Clearing firms also provide financing to their dealer customers by making payment for delivered securities even if the dealer does not have sufficient funds on deposit with the clearing firm. This financing is provided through a line of credit ("clearing loans") collateralized by securities owned by the dealers which are deposited in the dealers' clearing accounts. Generally, the loan and securities balances in each clearing account fluctuate daily as securities and funds are transferred into and out of the account at the request of the dealer.
In addition to their clearing function, clearing firms typically make available to their dealer customers segregation accounts for the safekeeping of securities which are fully paid for by the dealer's own customers and are not to be valued or used as security by the clearing firms for the *571 clearing loans to their dealer customers. Safekeeping of securities is frequently accomplished by way of "omnibus safekeeping" arrangements. Under such arrangements, the clearing firm places securities in safekeeping accounts for the benefit of its dealer customers labelled according to the name of the dealer from which or for whom the securities were received. No further information is recorded. Certificated securities are typically physically segregated by either tagging the specific securities or placing the securities in separate envelopes or folders. Safekeeping of book-entry securities is accomplished by a book-keeping arrangement where the clearing firm records the securities as being held in safekeeping for the account of a particular dealer. If the clearing firm is not a depository institution, it might also instruct the depository institution where it maintains its book entry accounts to record the interest of the dealer in the securities.
Under most omnibus safekeeping arrangements, the clearing firm acts solely on instructions from, and on behalf of, its dealer customers to receive and deliver securities and funds. The clearing firm does not accept instructions from and has no knowledge of, or relationship with, the customers of its dealer customers. The dealer manages and controls its relationship with its own customers.
Under some safekeeping arrangements, certain clearing firms maintain subaccounts or adopt bookkeeping practices which identify in some fashion the customers of their dealer customers. The degree of segregation identification varies according to the practice of the individual clearing firm and, in some cases, upon the amount of information given to the clearing firm by the dealer from which the instruction to segregate was received. The clearing firm may either segregate securities for the account of the dealer only (as in the usual omnibus safekeeping arrangement), for the dealer's customers in general or for the dealer's customers individually by customer name.
Safekeeping of securities is sometimes accomplished pursuant to tripartite repo agreements under which the dealer, the repo participant and the clearing firm enter into a master agreement which governs the terms and conditions of the repurchase of the securities. Under such an agreement, the purchased securities are delivered by the dealer to the clearing firm which acts as an agent for both participants and maintains an account for the dealer and an account for the repo participant. See, Goldman Rep., pp. 19-20.
C. The Test Cases
1. Overview.
On the filing dates of the AMC reorganization proceeding and the BBS, Inc. liquidation proceeding, the debtors were in the midst of numerous open repo and reverse repo transactions. Performance under the repo and reverse repo agreements which are the subject of the instant test cases had not been completed. Thus, the debtors had not paid the repo participants the principal amounts of the repurchase agreements and the interest due thereon in exchange for the securities, and, correspondingly, had not returned the securities to the reverse repo participants in exchange for the principal amount of the reverse repurchase agreements and the interest due thereon.
Generally, the repo and reverse repo transactions in which the debtors were engaged were memorialized in three categories of documents: (1) a trade ticket; (2) two separate confirmations generated on or about the same day as the trade date and sent to the customer contemporaneously; and (3) standard forms of agreement.
The trade tickets generated by AMC and BBS, Inc. generally set forth the name of the repo or reverse repo customer, a description of the security involved in the transaction, and the terms of the transaction. The initial price paid for the security is denominated on the trade tickets as "$'s financed."
The two confirmations issued by BBS, Inc. and AMC memorialized the two parts *572 of each repo or reverse repo transaction. In addition to the information contained on the trade tickets, the confirmations also set forth delivery instructions, if any, relating to the custody of the security during the duration of the repo or reverse repo transaction. The confirmation slips were framed in the language of a purchase and sale. Thus, with regard to reverse repurchase transactions, the first confirmation stated the terms of the acquisition by AMC or BBS, Inc. of the security, and contained a capacity code which noted that "as principal for our own account we have bought from you." The second confirmation stated the terms of the reverse repo customer's agreement to reacquire the security at a future date and contained a capacity code which read "As principal for our own account we have sold to you." Similarly, with regard to repo transactions, the first confirmation stated the terms of the repo customer's acquisition of the security and contained a capacity code "as principal for our own account we have sold to you." The second confirmation stated the terms of the agreement by AMC and BBS, Inc. to reacquire the security and contained the capacity code "as principal for our own account we have bought from you." However, the amount to be paid on the maturity of the repo or reverse repo transaction in addition to the original fixed principal amount is denominated on the confirmations as the "interest" or "repo interest." The confirmation slips also contain a proviso which reserves to AMC or BBS, Inc. the right to hypothecate the subject securities "under circumstances that will permit the commingling thereof with securities carried for the account of other customers."
The Repurchase and Reverse Repurchase Agreements memorialize only the second part of the repo or reverse repo transactions. The standard Repurchase Agreement sets forth the terms of the agreement of AMC or BBS, Inc. to reacquire the security from the repo customer. In these Agreements, AMC or BBS, Inc. were termed the "buyer" and the repo customer was termed the "seller." BBS, Inc. and AMC reserved to themselves a "right of substitution." In addition, any maturing coupons were to be the property of AMC and BBS, Inc. Lastly, the standard Repurchase Agreement provided that the securities could be sold by the repo participant upon default of the obligation of AMC or BBS, Inc. to repurchase the security.
The standard Reverse Repurchase Agreement identifies BBS, Inc. or AMC as "the seller" and the reverse repo participant as "the buyer." The Agreement provided that maturing coupons were to be the property of the reverse repo participant, and that BBS, Inc. or AMC could sell the security upon default of the obligation of the reverse repo participant to repurchase the security. Under the Agreement, any margin or other funds of the reverse repo participant held by BBS, Inc. or AMC could be applied by BBS, Inc. or AMC to offset any loss sustained by virtue of a default. In addition, the standard Reverse Repurchase Agreement states that BBS, Inc. or AMC may request additional margin any time during the life of the agreement. Unlike the standard Repurchase Agreement, the Reverse Repurchase Agreement did not confer upon AMC or BBS, Inc. an express "right of substitution."
Prior to the filing dates of the AMC reorganization proceeding and the BBS, Inc. liquidation proceeding, both dealers utilized the clearing, financing and custodial services of SPCSC. SPCSC, with offices and principal operations in New York City, is a clearing firm which clears transactions in government and agency securities and municipal securities. Guardino Aff., ś 3. Both AMC and BBS, Inc. previously used as their clearing agent Bradford Trust Company ("Bradford"), a New York corporation having its principal place of business in New York City. Bradford withdrew from its clearing agency business with AMC and BBS, Inc. in or around March, 1985, but had previously arranged for the transfer of that business to SPCSC.
On May 22, 1984, SPCSC entered into a "Clearing, Custody and Financing Agreement" with AMC and an identical agreement with BBS, Inc. ("the Clearing Agreements") *573 pursuant to which SPCSC established and maintained separate clearing and safekeeping accounts for both dealers. All four of these accounts were for transactions in government or agency securities. AMC and BBS, Inc. transacted some business with SPCSC following the execution of the Clearing Agreements, but the volume of business remained at a comparatively low level until March 1985 when Bradford terminated its relationship with the two dealers.
With regard to the clearing accounts maintained by SPCSC, paragraph 6 of the Clearing Agreements granted SPCSC a "security interest in, and a lien upon" the securities in SPCSC's possession, and continued, in relevant part:
Regarding Collateral [i.e., clearing account securities] in SPCSC's possession or control, SPCSC shall use reasonable care in the custody and preservation of such collateral, but need not take any steps necessary to preserve rights against third parties, unless instructed by [AMC or BBS, Inc.] . . . SPCSC may use and deal with the collateral and bear the risk and benefit thereof . . . without retaining possession or control of a like amount of collateral and without notice to [AMC or BBS, Inc.].
Paragraph 4(c) further granted SPCSC the unilateral right to disregard AMC's or BBS, Inc.'s instructions to place securities in safekeeping or to deliver securities from the clearing accounts to the dealers' customers:
SPCSC need not remove any collateral (as defined in Paragraph 6 hereof) from the [lien] of SPCSC, including by designating such as customer securities or fully paid securities or by effecting the delivery thereof free of payment, if after giving effect thereto SPCSC shall deem itself less than adequately secured or [AMC or BBS, Inc.] shall not be in compliance with SPCSC's credit policies. Any instruction from [AMC or BBS, Inc.] in contravention of the foregoing shall be of no force or effect regardless of any action by SPCSC.
With regard to the safekeeping accounts maintained by SPCSC, the Clearing Agreements allowed SPCSC to "hold securities which [AMC or BBS, Inc.] identifies in writing to SPCSC as fully paid securities by entering same on its books in a denominated account" (para. 3(h)). The agreements expressly provided that the security interest of SPCSC "shall not extend to securities which SPCSC in accordance with [AMC's or BBS, Inc.'s] instructions shall have entered on its books as a denominated account for fully paid securities" (para. 6). Securities in such segregated accounts were not to be "reclassified or otherwise disposed of except upon receipt by SPCSC of [AMC's or BBS, Inc.'s] written instructions" (para. 3(h)). Under the Clearing Agreements, AMC and BBS, Inc. represented and warranted that securities delivered to SPCSC were unencumbered by "any rights, claims or interest of any third party except the rights of [AMC's or BBS, Inc.'s] customers in securities which SPCSC shall have entered on its books as an account denominated fully paid securities" (para. 9(c)).
SPCSC generally received instructions to take delivery of certificated securities in one of three ways: (1) by hand delivery of preprinted "Receive Ticket" filled out by AMC or BBS, Inc.; (2) by receipt of handwritten instructions from AMC or BBS, Inc. transmitted by telecopier ("DEX Instructions"); or (3) by oral instruction over the telephone, from which Receive Tickets were generated by an SPCSC account manager. Guardino Aff., para. 7. The instructions customarily identified the customer account (clearing or safekeeping) into which the security was to be placed. Upon receipt of the securities from the contra party of AMC or BBS, Inc., SPCSC placed them in the appropriate account in the SPCSC vault. Securities in the vault were filed according to account and maintained in a separate file from all other accounts belonging to AMC or BBS, Inc. and all other customers of SPCSC. Within each account file, securities were arranged according to type (e.g., GNMA securities *574 were filed together) and within the type of security the files were maintained in ascending order of pool number. Id., para. 17.
Instructions by AMC or BBS, Inc. to move a security from one account to another (i.e., from clearing to safekeeping or vice versa) were also transmitted to SPCSC by oral or written instructions. Upon receipt of such an instruction, typically a "Seg Move Ticket" would be prepared by an SPCSC account manager to accomplish the movement. Id., para. 15. When SPCSC vault personnel received the Seg Move Ticket, the certificate was physically moved from its original account file to the separate file of the account designated on the Seg Move Ticket. Id., para. 17.
For purposes of processing book-entry transactions on behalf of its dealer customers, SPCSC maintains book entry accounts at its bank, Security Pacific National Trust Co. ("SPNTCo."), which, as a depository institution, in turn maintains book entry accounts at a Federal Reserve Bank. SPCSC processes the book-entry transactions of its customer through a service known as the "SPEED" (Security Pacific Easy Electronic Delivery) system, which operates as a computer interface with Fedwire. SPCSC's customers' book-entry transactions are processed through SPCSC's book-entry accounts at SPNTCo. Each customer of SPCSC is assigned a sub-title to which its book-entry transactions are allocated by the SPEED system within SPCSC's book-entry accounts. Guardino Aff., para. 18.
SPCSC received instructions from AMC and BBS, Inc. to take delivery of a book-entry security in the same manner it received notice to take delivery of a certificated security: AMC or BBS, Inc. either delivered a Receive Ticket to SPCSC setting forth the anticipated date of receipt of the book-entry security, or transmitted a DEX Instruction to SPCSC to receive the security. Id., para. 19. The information on the Receive Ticket or on the DEX Instruction was then put into the SPEED system, and upon electronic transfer of the book-entry security by the depository institution of the contra party a so-called SPEED Ticket was generated evidencing delivery of the security to SPCSC's book-entry account at SPNTCo. for AMC or BBS, Inc. Id., para. 21 and 22.
Seg Move Tickets were also prepared by SPCSC when AMC or BBS, Inc. instructed it to move book-entry securities between their clearing and safekeeping accounts. While the movement was then entered into SPCSC's records, there was no corresponding change of the account designation made in the records of either SPNTCo. or the Federal Reserve System. Id., para 26.
SPCSC did not place securities, certificated or book-entry, in safekeeping for anyone other than its dealer customers. Viviano Rep., p. 6. The Clearing Agreements permitted AMC and BBS, Inc. to establish within their accounts one or more special accounts for their customers (para. 3(a)). However, at no time were securities in SPCSC's vault actually filed by reference to the name of AMC's or BBS, Inc.'s customers or by any form of sub-account designation of AMC's or BBS, Inc.'s customers. Guardino Aff., para. 17. Seg Move Tickets sometimes recorded the name of AMC's or BBS, Inc.'s customer in a box on the ticket denominated "customer." However, identification of the customer of AMC or BBS, Inc. in this manner depended, in part, on whether this information was included in the instructions transmitted to SPCSC. Id., para. 15. This information was entered on the Seg Move Ticket only for the purpose of assisting AMC or BBS, Inc. with their own record-keeping, and was not used by SPCSC for any purpose. Id.
2. The AMC Test Case Transactions.
As previously noted, transactions involving five securities were designated as test cases in the AMC reorganization proceeding. The securities and the repo and reverse repo participants claiming an interest in them are as follows: *575 

 Security Reverse Repo Customer Repo Customer
 a. GNMA Pool #69692, Merritt Commercial Worthen Bank &
 $1,000,000, 12% Savings & Loan Trust Co.
 due 8/15/13
 b. GNMA Pool #61337, First Savings & Loan First Federal
 $1,012,089, 12% of Perth Amboy Savings & Loan
 due 8/15/13 of Freeport
 c. U.S. Treasury Notes PennBank Champlain
 $3,000,000, 11.125% Valley Federal
 due 9/30/87 Savings & Loan
 d. GNMA Pool #40566, Universal Savings & Worthen Bank &
 $1,018,378, 11% Loan Association Trust Co.
 due 6/15/10
 e. GNMA Pool #57318, First Savings & Loan Lesney Products
 $500,000, 11.5% of Perth Amboy
 due 2/15/13

Selection of test cases in this proceeding was intended to take into account two factual variables which could potentially affect the legal rights and interests of repo claimants: (1) the location of the subject security as of the filing date of the bankruptcy proceeding (i.e., whether the security was in the AMC clearing or safekeeping account), and (2) whether the subject security was certificated or book-entry in form. The first and second of the above test cases were selected as being representative of AMC transactions involving certificated securities which were located in AMC's clearance account on the filing date of the reorganization proceeding. The third transaction was assigned test case status because it raises common issues relating to delivery or perfection of book-entry securities, portions of which were located in both the clearing and safekeeping accounts of AMC on the filing date. The fourth and fifth of the AMC test cases involve issues arising out of transactions involving certificated securities located in the AMC safekeeping account on the filing date.
In support of his present motion for summary judgment, the AMC Trustee has submitted five affidavits (one for each of the test case transactions) by Henry Green, a consultant retained by the Trustee shortly after his appointment. The Green affidavits recite in narrative fashion the history of each transaction as reflected in the underlying documents collected from the files and records of AMC and produced by Bradford and SPCSC. While the parties who have filed papers in opposition to the Trustee's motion differ as to the importance or significance of particular documents or the language contained in particular documents, they do not contest the essential facts set forth by Mr. Green in his affidavits. Therefore, for purposes of the present motions and cross-motions for summary judgment, the facts summarized below are undisputed. The exhibits cited below refer to the documents annexed to the Green affidavits.
a. GNMA Pool # 69692
On February 25, 1985, AMC entered into a reverse repo transaction with Merritt Commercial Savings & Loan ("Merritt") consisting of AMC's acquisition of the security from Merritt for the sum of $824,000 and a contemporaneous agreement under which Merritt agreed to reacquire the security from AMC on April 17, 1985, for the total sum of $834,156.94. This transaction was reflected in two customer confirmations issued by AMC to Merritt, one denoting Merritt's sale of the security to AMC and the second denoting AMC's agreement to resell the security to Merritt. (Exhibits "A-1" and "A-2"). AMC's agreement to *576 resell was also reflected in a reverse repurchase agreement (Exhibit "B"). Merritt delivered the security to AMC's clearing agent, Bradford, (Exhibits "D" and "E") which maintained it in AMC's account until March 12, 1985, when Bradford delivered the security to SPCSC for AMC's account, in connection with the termination of Bradford's clearing operations and the assumption of all of AMC's clearing services by SPCSC (Exhibit "N").
On March 21, 1985, the security was located in AMC's clearing account at SPCSC. On this date AMC entered into a repo with Worthen consisting of Worthen's acquisition of the security from AMC for the sum of $900,000 and a contemporaneous agreement that AMC would reacquire the security from Worthen on April 12, 1985, for the total sum of $905,060. The transaction was reflected in two customer confirmations issued by AMC to Worthen, denoting AMC's sale to Worthen and Worthen's agreement to resell to AMC, and a repo agreement (Exhibits "T-1," "T-2" and "U").
AMC's confirmation of the sale to Worthen contained delivery instructions indicating that the security was to be held in AMC's safekeeping account at SPCSC. (Exhibit "T-1"). However, no written delivery instructions from AMC to SPCSC directing movement of the security from the clearing account to the safekeeping account have been located among AMC's or SPCSC's records and the security remained in the clearing account until the filing of the Chapter 11 Petition.
b. GNMA Pool # 61337
On October 18, 1984, AMC entered into a reverse repo transaction with First Savings & Loan of Perth Amboy ("Perth Amboy") consisting of AMC's acquisition of the security from Perth Amboy for the sum of $848,000 and a contemporaneous agreement that Perth Amboy would reacquire the security from AMC on November 1, 1984, for the total sum of $851,792.44. This transaction was reflected in two customer confirmations issued by AMC to Perth Amboy denoting the sale to AMC and the agreed upon resale to Perth Amboy, (Exhibits "A-1" and "A-2") and a reverse repurchase agreement (Exhibit "B"). Perth Amboy delivered the security to AMC's clearing account at Bradford (Exhibit "E"). On March 11, 1985, the security was delivered by Bradford to AMC's clearing account at SPCSC in connection with Bradford's termination of clearing operations. (Exhibits "O" and "P").
Upon maturity of the reverse repo, AMC and Perth Amboy extended the term, or "rolled over," the reverse repo. Pursuant to the roll over, Perth Amboy agreed to reacquire the security on May 1, 1985, for the sum of $897,030.89. This transaction was reflected in two customer confirmations issued by AMC (Exhibits "J-1" and "J-2") and a reverse repurchase agreement (Exhibit "K").
On March 20, 1985, the security was located in AMC's clearing account at SPCSC. On that day, AMC entered into a repo with Freeport consisting of Freeport's acquisition of the security for the sum of $950,000 and a contemporaneous agreement by AMC to reacquire the security from Freeport on June 19, 1985, for the total sum of $972,212.95. This transaction was reflected in two customer confirmations issued by AMC to Freeport denoting AMC's sale to Freeport and Freeport's agreement to resell to AMC (Exhibits "Q-1" and "Q-2"), and a repurchase agreement (Exhibit "R").
The confirmation of the sale to Freeport contained delivery instructions to place the security in AMC's safekeeping account at SPCSC. (Exhibit "Q-1"). AMC Issued delivery instructions (DEX) advising SPCSC to move the security into safekeeping (Exhibit "T"). The DEX instruction identified Freeport as the customer to whom the security was sold. Although SPCSC received the instructions, the security was not moved into safekeeping and remained in the clearing account until the filing of the Chapter 11 Petition.
c. U.S. Treasury Notes, 11.125%
On October 17, 1984, AMC entered into a reverse repurchase transaction with PennBank *577 consisting of AMC's acquisition of the Treasury Notes for the sum of $2,756,000 and a contemporaneous agreement by PennBank to reacquire the security on April 15, 1985, for the sum of $2,903,101.50. This transaction was reflected in two customer confirmations issued by AMC to PennBank denoting PennBank's sale and agreement to repurchase, (Exhibits "A-1", "A-2"), and a reverse repurchase agreement (Exhibit "B"). AMC's confirmation of its purchase from PennBank contained delivery instructions advising PennBank to deliver the security to AMC's account at Bradford ("A-1"). PennBank delivered the securities to AMC's clearing account at Bradford on October 17, 1984 through the appropriate book entry wire transfer (Exhibit "E").
On March 18, 1985, AMC entered into a repo with Champlain consisting of Champlain's acquisition of $510,000 of the security for the sum of $531,420 and a contemporaneous agreement by AMC to reacquire the security on May 20, 1985 for the sum of $546,727.85. This transaction was reflected by two customer confirmations issued by AMC to Champlain denoting Champlain's purchase and agreement to resell to AMC, and a written repurchase agreement (Exhibits "I-1," "I-2" and "J").
The customer confirmation of Champlain's purchase contained instructions for AMC to hold the security in safekeeping (Exhibit "I-1"). AMC instructed SPCSC to move $510,000 of the security into safekeeping by DEX instruction dated March 18, 1985, which instruction denominated Champlain as the purchaser (Exhibit "L"). SPCSC accomplished the movement and generated a "Seg Mov ticket" which noted that Champlain was AMC's customer (Exhibit "M").
Through a series of subsequent movements, accomplished by adjustments made by SPCSC without written instructions from AMC, all but $175,000 of the security was transferred out of safekeeping into clearing (Exhibits "Q" through "X").
d. GNMA Pool # 40566
Between June, 1984, and January, 1985, AMC entered into a series of reverse repo transactions with Universal Savings & Loan ("Universal") with respect to the security (Exhibit "A"). When the last of these transactions matured on January 4, 1985, the security was left with AMC and placed in its safekeeping account at Bradford (Exhibits "C" through "G").
On February 25, 1985, AMC entered into another reverse repo transaction with Universal consisting of AMC's acquisition of the security from Universal for the sum of $730,000 and a contemporaneous agreement under which Universal agreed to reacquire the security from AMC on May 28, 1985, for the sum of $747,023.09. The transaction was reflected in two customer confirmations issued by AMC to Universal, denoting Universal's sale to AMC and agreement to repurchase (Exhibits "H-1" and "H-2"), and a reverse repurchase agreement (Exhibit "I"). Delivery to AMC was accomplished by movement of the security from AMC's safekeeping account at Bradford to its clearing account (Exhibits "K", "L" and "M").
On March 11, 1985, Bradford delivered the security to AMC's clearing account at SPCSC in connection with the termination of Bradford's clearing services. (Exhibits "N" and "O").
On March 14, 1985, AMC entered into a repo with Worthen consisting of Worthen's acquisition of the security for the sum of $697,000, and a contemporaneous agreement under which AMC agreed to reacquire the security for the sum of $700,171.35 on April 1, 1985. The transaction was reflected in two customer confirmations issued by AMC to Worthen (Exhibits "Q-1" and "Q-2"), denoting Worthen's purchase agreement to resell to AMC and a repo agreement (Exhibit "R"). The delivery instructions on the confirmation of the sale to Worthen indicated that the security was to be held in safekeeping (Exhibit "P-1").
The security was moved from AMC's clearing account at SPCSC to its safekeeping *578 account on March 14, 1985 (Exhibits "V" and "W"). The delivery instructions (DEX) from AMC to SPCSC directing the movement to safekeeping designated Worthen as the purchaser (Exhibit "T") and SPCSC generated a "seg move ticket" which noted that Worthen was AMC's customer (Exhibit "U").
Upon the maturity of the repo, AMC and Worthen twice extended or "rolled over" the transaction (Exhibits "Y" and "AA"). The second roll over provided for AMC's reacquisition of the security from Worthen on April 16, 1985, in exchange for $788,371.10. The delivery instruction on the confirmation read NO-DEL, indicating that the security was to remain in AMC's safekeeping account (Exhibit "AA-1"). The security was located in AMC's safekeeping account on the date of the Chapter 11 filing. (Exhibit "EE").
e. GNMA Pool # 57318
On October 17, 1984 AMC entered into a reverse repo with Perth Amboy. The transaction consisted of AMC's acquisition of the security for the sum of $283,000 and Perth Amboy's contemporaneous agreement to reacquire the security from AMC on April 15, 1985 for the sum of $298,423.50. The transaction was reflected in two customer confirmations issued by AMC to Perth Amboy, denoting a sale to AMC and the agreed upon sale back to Perth Amboy (Exhibits "A-1" and "A-2"), and a reverse repurchase agreement (Exhibit "B").
The delivery instructions on the customer confirmation of the sale to AMC instructed Perth Amboy to deliver the security to AMC's account at Bradford (Exhibit "A-1"). Bradford received the security into AMC's clearing account on October 17, 1984. (Exhibit "E").
On March 11, 1985, Bradford delivered the security to AMC's clearing account at SPCSC in connection with Bradford's termination of clearing operations (Exhibits "M" and "N"). On March 12, 1985, AMC issued delivery instructions (DEX) to SPCSC to move the security to its safekeeping account (Exhibit "O"). The DEX instructions contained no indication of the AMC customer for whom the security was to be held in safekeeping.
On April 1, 1985, the security was still located in AMC's safekeeping account. On this date AMC entered into the first of three successive repos with Lesney Products with respect to the security. The initial transaction consisted of Lesney's acquisition of the security from AMC for the sum of $447,000 and a contemporaneous agreement by AMC to reacquire the security on April 2, 1985 for the sum of $447,107.09. This transaction was reflected in two customer confirmations issued by AMC to Lesney, denoting Lesney's purchase and agreement to resell (Exhibits "R-1" and "R-2"). No written repo contract has been located among the records of either AMC or Lesney. The internal trade ticket documenting this repo transaction noted that the security was to be held for Lesney in safekeeping.
AMC and Lesney agreed to two extensions, or roll overs, of the original term of the repo, the final extension providing that AMC would reacquire the security on April 8, 1985 for the sum of $445,412.86. Two customer confirmations reflecting this transaction were issued by AMC to Lesney. No written repurchase contract with respect to either of the two roll overs has been located by AMC or Lesney. Each of the customer confirmations issued to Lesney in connection with the original transaction and the roll overs contained the delivery instructions "NO DEL." The security was located in AMC's safekeeping account at SPCSC on the date the Chapter 11 Petition was filed.
3. The BBS, Inc. Test Case Transactions
The BBS, Inc. Trustee seeks summary judgment or partial summary judgment with regard to four of the five test cases set forth in his complaint. The securities and the repo and reverse repo participants involved in these test cases are as follows: *579 

 Securities Reverse Repo Customer Repo Customer
 a. GNMA Pool #47448 Fidelity New York, Champlain Valley
 $500,000, 11.5% F.A. Federal Savings
 due 4/15/11 & Loan
 b. GNMA Pool #63571 Fidelity New York, Worthen Bank
 $1,020,000, 11.5% F.A. & Trust Co.,
 due 2/15/13 N.A.
 c. FHLB, Cusip Mainland Savings Champlain Valley
 #313388MX5, & Loan Federal Savings
 $2,000,000, 11.2% & Loan
 due 1/25/90
 d. U.S. Treasury Bills City of Harrisburg Worthen Bank &
 $4,300,000, Trust Co., N.A.
 due 12/26/85

The first and second test cases were selected as being representative of BBS, Inc. transactions involving certificated securities which were located in the BBS, Inc. safekeeping account on the filing date of the BBS, Inc. liquidation proceeding. The securities involved in the third and fourth test cases are book-entry securities. On the filing date, the FHLB security was recorded as being located in the BBS, Inc. safekeeping account, whereas the Treasury Bills were recorded as being located in its clearance account.
In support of his present motion, the BBS, Inc. Trustee has submitted the affidavit of Roger Landon, in which he sets forth the factual history of each test case transaction gleaned from documents generated by BBS, Inc. and SPCSC. These facts are not in dispute.
a. GNMA Pool # 47448
On May 2, 1984, BBS, Inc. entered into a reverse repo transaction with Fidelity consisting of BBS, Inc.'s acquisition of the security from Fidelity for the sum of $336,000 and a contemporaneous agreement under which Fidelity agreed to reacquire the security from BBS, Inc. on November 1, 1984 for the total sum of $354,361. On November 1, 1984, BBS, Inc. and Fidelity "rolled over" the repo transaction. The roll over provided for the acquisition of the security by BBS, Inc. for the sum of $390,000, which amount was offset by the $336,000 principal amount already paid to Fidelity under the original repo transaction. Fidelity contemporaneously agreed to reacquire the security from BBS, Inc. on May 1, 1985 for the total repurchase price of $411,569.17. The roll over transaction was reflected in two customer confirmations issued by BBS, Inc. to Fidelity, denoting the sale to BBS, Inc. and the agreed upon sale back to Fidelity (Landon Aff., Exhibits 5-6), and a reverse repurchase agreement (Id., Exhibit 8).
The security was the subject of a repo transaction dated June 1, 1984 between BBS, Inc. and First Federal Savings & Loan of Waterbury. This repo transaction was rolled over several times and was eventually closed out on March 11, 1985 (Landon Aff., para. 16).
On March 29, 1985, BBS, Inc. entered into a repo transaction with Champlain consisting of Champlain's acquisition of the security for the sum of $418,000, and a contemporaneous agreement under which BBS, Inc. agreed to reacquire the security for the total sum of $427,405 on June 27, 1985. The transaction was reflected in two customer confirmations issued by BBS, Inc. to Champlain (Id., Exhibits 3 and 4), denoting Champlain's purchase and agreement to resell to BBS, Inc. and a repo agreement (Id., Exhibit 7). The delivery instructions on the confirmation of the sale to Champlain noted that the security was to be held in safekeeping.
*580 In accordance with the delivery instructions listed on the opening confirmation, and on the DEX instructions transmitted by BBS, Inc. to SPCSC (Id., Exhibit 9), the security was placed in the safekeeping account of BBS, Inc. at SPCSC on March 29, 1985, and remained there as of April 8, 1985 (See, Id., Exhibits 10 and 11).
b. GNMA Pool # 63571
On February 6, 1984, BBS, Inc. entered into a reverse repo transaction with Fidelity pursuant to which BBS, Inc. acquired the GNMA security for the sum of $800,000 and Fidelity contemporaneously agreed to reacquire the security on a specified future date. The reverse repo transaction was "rolled over" on August 1, 1984. Under the roll over reverse repo transaction, BBS, Inc. acquired the security for the sum of $729,000. Fidelity agreed to repurchase the security on April 26, 1985 for the total sum of $795,046.59. The roll over transaction was reflected in two customer confirmations issued by BBS, Inc. to Fidelity denoting Fidelity's sale and agreement to repurchase (Id., Exhibits 13 and 14) and a reverse repurchase agreement (Id., Exhibit 15).
The security was the subject of a repo transaction dated February 29, 1984 between BBS, Inc. and First Federal Savings & Loan Association of Lincoln which was rolled over several times before closing out on February 26, 1985.
On March 7, 1985, BBS, Inc. entered into a repo transaction with Worthen consisting of Worthen's acquisition of the security for $897,000 and a contemporaneous agreement of BBS, Inc. to reacquire the security on April 3, 1985 for the total sum of $903,222.93. Two customer confirmations denoting Worthen's purchase and agreement to resell (Id., Exhibits 16 and 17) and a repurchase agreement (Id., Exhibit 18) were generated by BBS, Inc. In accordance with the delivery instructions on the opening confirmation and the DEX instructions transmitted to SPCSC (Id., Exhibit 19), the security was received into the BBS, Inc. safekeeping account at SPCSC on March 7, 1985 (see Id., Exhibit 20).
BBS, Inc. and Worthen agreed to roll over the repo transaction on April 3, 1985. This renewal of the repo transaction was also reflected in two customer confirmations (id., Exhibits 22 and 23) denoting Worthen's acquisition of the security for $895,000 and the contemporaneous agreement by BBS, Inc. to repurchase the security on April 10, 1985 for the total sum of $896,522.74. The delivery instructions on the opening confirmation read "no delivery," indicating that the security was to remain in the BBS, Inc. safekeeping account, where it was located on the filing date of this liquidation proceeding (see, id., Exhibit 24).
c. FHLB, Cusip # 31388MX5
On February 20, 1985, BBS, Inc. entered into a reverse repo transaction with Mainland Savings & Loan ("Mainland"). The original transaction was followed by a series of roll overs, the last of which occurred on April 3, 1985. The final roll over was reflected in two customer confirmations (id., Exhibits 27 and 28) denoting the acquisition of the securities by BBS, Inc. for $1,880,000 and the contemporaneous agreement of Mainland to reacquire the securities on April 17, 1985 for the total sum of $1,886,397.22. BBS, Inc. also generated a standard reverse repurchase agreement with regard to this last roll over (id., Exhibit 29).
During the course of the series of reverse repurchase transactions with Mainland, BBS, Inc. entered into several repo transactions with respect to varying amounts of the FHLB securities. One amount having a par value of $930,000, was substituted by BBS, Inc. for Treasury Bills which were the subject of a repo transaction between BBS, Inc. and the City of Austin dated January 9, 1985 pursuant to which the City of Austin paid BBS, Inc. the sum of $927,000 and BBS, Inc. contemporaneously agreed to reacquire the securities on June 28, 1985 for the total sum of $963,420.80. (See, id., Exhibits 30 and 31). *581 In accordance with the delivery instructions on the opening confirmation of this repo transaction and the DEX instructions transmitted to SPCSC by BBS, Inc. (Id., Exhibit 32), the $930,000 amount of the FHLB securities was delivered to the City of Austin against payment of the $927,000 purchase price on February 27, 1985, and apparently was liquidated by the City of Austin on or after the filing date of this proceeding.
Another amount of the FHLB securities, having a principal value of $280,000, was the subject of a repo transaction entered between BBS, Inc. and Champlain on March 29, 1985. Two customer confirmations were issued by BBS, Inc. to Champlain (id., Exhibits 34 and 35) reflecting Champlain's initial purchase of the FHLB securities for $289,000 and BBS, Inc.'s contemporaneous agreement to repurchase the securities on June 27, 1985 for the total sum of $295,502.50. A repurchase agreement was also generated by BBS, Inc. (id., Exhibit 36). The delivery instructions on the opening confirmation and the DEX instructions note that the securities were to be delivered into safekeeping, and in fact were recorded as being held in the BBS, Inc. safekeeping account as of April 8, 1985 (see, id., Exhibit 38).
d. U.S. Treasury Bills, Cusip # 912794HQO
The City of Harrisburg initially purchased the U.S. Treasury Bills from BBS, Inc. in two positions. The first position having a value at maturity of $3,200,000 was purchased for $2,933,648 on January 2, 1985. The second position, having a value at maturity of $1,100,000, was purchased for $1,018,032.88 on January 28, 1985. BBS, Inc. entered into reverse repo transactions with Harrisburg with respect to these positions on January 4 and January 29, 1985, respectively. BBS, Inc. and Harrisburg twice "rolled over" the reverse repo transactions. The second roll over provided for the purchase of the two positions by BBS, Inc. for $2,964,000 and $1,018,000, and Harrisburg contemporaneously agreed to reacquire on May 15, 1985 the first position for the total sum of $2,998,580 and the second position for $1,029,867.67. This final roll over was memorialized in four confirmations (two for each position) (id., Exhibits 44, 45, 46 and 47) and two separate reverse repurchase agreements (id., Exhibits 48 and 49).
BBS, Inc. entered into a number of repo transactions involving varying amounts of the U.S. Treasury Bills subsequent to the entry of the reverse repo transactions with Harrisburg. One amount, having a value at maturity of $870,000, was the subject of a repo transaction between Dominion Bank, N.A. ("Dominion") and BBS, Inc. entered on February 20, 1985 and scheduled to close on May 21, 1985. Another amount of the Treasury Bills, having a value at maturity of $580,000, was substituted on February 25, 1985 for another security which was the subject of a repo transaction between BBS, Inc. and the County of Dauphin, Pennsylvania ("Dauphin") dated January 16, 1985. The repo transaction between BBS, Inc. and Dauphin was rolled over on February 27, 1985 and was scheduled to close on April 19, 1985. A third amount of the Treasury Bills, having a value at maturity of $700,000, was the subject of a repo transaction between BBS, Inc. and Hamilton Bank ("Hamilton") which was opened on April 4, 1985 and was scheduled to close on May 6, 1985. Dominion, Dauphin and Hamilton each took possession of the amounts of the Treasury Bills involved in their respective repo transactions with BBS, Inc., and subsequent to the filing date of the within liquidation proceeding, they each liquidated the Treasury Bills in their possession.
A fourth block of Treasury Bills having a value at maturity of $1,440,000 was the subject of a repo transaction between BBS, Inc. and Worthen on April 4, 1985. Two customer confirmations were issued by BBS, Inc. to Worthen (id., Exhibits 70 and 71) reflecting Worthen's initial purchase of the Treasury Bills for $1,346,000 and BBS, Inc.'s contemporaneous agreement to repurchase the securities on April 11, 1985 for the total sum of $1,348,316.24.
*582 On April 4, 1985, BBS, Inc. instructed SPCSC to move the securities from its clearing account to its safekeeping account (id., Exhibit 72). However, as of April 8, 1985, $1,450,000 of the original amount of Treasury Bills remained in the BBS, Inc. clearing account.
The remaining $700,000 of the $4,300,000 of the Treasury Bills which were the subject of the reverse repo transactions between BBS, Inc. and Harrisburg was used by BBS, Inc. to satisfy margin requirements of institutions of which BBS, Inc. was a customer.
IV. ISSUES
The object of the pending motions and cross-motions for summary judgment is to determine whether the securities underlying the test case repo and reverse repo transactions (or the proceeds of the sale thereof) are property of the AMC or BBS, Inc. estates or belong instead to the repo participants or reverse repo participants. The property interests of the respective parties are critically affected by resolution of the question whether repo and reverse repo transactions are properly characterized as purchase-and-sale transactions or secured loan transactions. That is to say, are they transactions involving an initial contract for the sale (or purchase) of securities, subject to a simultaneously executed contract for their repurchase (or resale) at an agreed date, or are they secured loan transactions pursuant to which the securities served as collateral for the repayment of the original loan amount on an agreed date at an agreed rate of interest? A number of subsidiary issues are necessarily dependent upon the determination of the legal status of repo and reverse repo transactions.
If repo and reverse repo transactions are purchases and sales, then a determination must be made as to whether the repo participants (a) took delivery of the securities pursuant to § 8-313(1) of the Uniform Commercial Code of New Jersey, N.J.S.A. 12A:8-313(1) ("the N.J.U.C.C.") or received transfer of the securities under § 8-313(1) of the Uniform Commercial Code of New York, N.Y. Consolidated Laws, Uniform Commercial Code § 8-313 (McKinney Supp. 1986) ("the N.Y.U.C.C."), and/or (b) attained the status of bona fide purchasers pursuant to § 8-301(2) of the N.J.U.C.C. or § 8-302(3) of the N.Y.U.C.C. If repo participants did not take delivery or receive transfer of the securities and are not bona fide purchasers, then a further determination must be made as to whether the reverse repo agreements are "executory" contracts within the meaning of 11 U.S.C. § 365, and can therefore be rejected by the Trustees if deemed burdensome to the estates.
If repo and reverse repo transactions are secured loans, then a determination must be made as to whether the repo participants perfected a security interest in the securities pursuant to § 9-305 of the N.J.U.C.C. or § 8-321(2) of the N.Y.U.C.C. If the repo participants did not perfect security interests in the securities (and are not bona fide purchasers of the securities), then a further determination must be made as to whether reverse repo participants should be equitably estopped from exercising their rights to reclaim the securities pledged as collateral for their loans from AMC or BBS, Inc.
Lastly, the motions and cross-motions filed in the BBS, Inc. adversary proceeding raise the issue of whether repo and reverse repo participants were "customers" of BBS, Inc. within the meaning of 15 U.S.C. § 78111(2).
V. DISCUSSION
In order to prevail on a motion for summary judgment, the moving party must establish that "there is no genuine issue as to any material fact and that (it) is entitled to a judgment as a matter of law." Fed.R. Civ.P. 56(c). Once the moving party has carried its burden under Rule 56, "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp., ___ U.S. ___, ___, 106 S.Ct. 1348, 1356, 89 *583 L.Ed.2d 538, 552 (1986), rev'g. 723 F.2d 238 (3d Cir.1983). The opposing party must set forth specific facts showing a genuine issue for trial and may not rest upon the mere allegations or denials of its pleadings. Delong Corp. v. Raymond International, Inc., 622 F.2d 1135, 1139 (3d Cir.1980). The Supreme Court recently explained that in evaluating the evidence presented, "(w)here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no `genuine issue for trial.'" Matsushita, ___ U.S. at ___, 106 S.Ct. at 1356, 89 L.Ed.2d at 552.
When considering a motion for summary judgment, all evidence submitted must be viewed in a light most favorable to the party opposing the motion. Wahl v. Rexnord, 624 F.2d 1169, 1181 (3d Cir.1980). As I noted in Brown v. Hilton, 492 F.Supp. 771, 774 (D.N.J.1980):
[A] court is required to resolve all ambiguities and draw all inferences in favor of the party against whom summary judgment is sought. Furthermore, even when the material facts are not in dispute, summary judgment may be inappropriate when contradictory inferences may be drawn from the facts.
However, in non-jury cases such as the present adversary proceedings, it is entirely appropriate for the court, as the ultimate finder of fact, to resolve competing factual inferences that may reasonably be drawn from the evidence on summary judgment if a full evidentiary hearing or trial would not enhance the court's ability to draw such inferences and conclusions of fact. Nunez v. Superior Oil Co., 572 F.2d 1119, 1123-24 (5th Cir.1978); United States v. ACB Sales & Services, Inc., 590 F.Supp. 561, 569 (D.Ariz.1984). As stated in the ACB Sales case:
The propriety of summary judgment in a nonjury case should rest less upon the at times purely semantic distinction between questions of law and fact and more upon the question of whether a full evidentiary hearing would serve any real purpose. If the underlying evidentiary facts are undisputed and, thus, full trial would serve only the purpose of supplanting affidavits and transcripts with live testimony, then resolving the ultimate factual issue in a motion for summary judgment is appropriate.
Id. at 569.
In the present test cases, the factual record is voluminous and exhaustive. As previously noted, the documentary evidence reflecting the repo and reverse repo transactions at issue is uncontroverted. The principal dispute between the parties to the present motions and cross-motions revolves around the legal significance and consequences of material facts which are not in dispute. To the extent that undisputed material facts give rise to conflicting factual inferences (which customarily should be resolved in favor of the party opposing summary judgment), the record in the present proceedings is sufficiently well-developed to warrant a determination on summary judgment of any such disputed factual inferences.
The record includes the reports, affidavits and/or transcripts of deposition testimony of various experts which set forth conflicting opinions as to (1) the economic or financial significance of repo and reverse repo transactions and (2) the social and economic significance of certain legal determinations which particular parties are advocating in the present motions and cross-motions. Live testimony by these same experts at a full evidentiary hearing or trial would be largely duplicative and superfluous. Such live testimony would not significantly contribute to the already extensive factual record nor appreciably enhance the court's ability to draw its own inferences and conclusions from undisputed material facts. Delaying drawing such inferences and conclusions until after a full evidentiary hearing or trial would therefore unnecessarily prolong these proceedings and add to the expense of the bankrupt estates and their creditors, a result which would be inimical to the policy of economy of administration in bankruptcy cases.
Furthermore, there are factual disputes as to certain attributes of the repo and *584 reverse repo transactions which are the subject of the present motions and cross-motions. For example, the parties disagree as to the size of the "haircuts" in the original purchase prices of the underlying securities and the transfer costs associated with actual delivery of securities in possessory repo transactions. However, these facts, and others in dispute are not material, insofar as the resolution of such factual issues would not affect the outcome of the motions and cross-motions. The same conclusions of law would be reached regardless of how these factual disputes are ultimately resolved.
A. Legal Characterization of Repo and Reverse Repo Transactions.
1. Contentions of the Parties
The AMC and BBS, Inc. Trustees have adopted opposing views as to the legal characterization of repo and reverse repo transactions. The AMC Trustee regards the characterization of such transactions as a straight-forward matter of contract interpretation. He argues that the determination as to whether repo and reverse repo agreements are contracts of purchase and sale or secured loan agreements should be governed by the intent of the parties to these agreements, as reflected in the transaction documents. The AMC Trustee asserts that the language employed in the documents memorializing the transactions clearly and unambiguously reflects an intention to purchase and sell the underlying securities.
The AMC Trustee further argues that it is neither required nor appropriate to look beyond the language of the written instruments if this language leaves no doubt as to its meaning. Nevertheless, he contends that extrinsic evidence relating to the situation of the parties and the circumstances of the agreements, as well as important public policy considerations and applicable decisional law, support a conclusion that repo and reverse repo transactions are purchases and sales as a matter of law. In particular, the AMC Trustee asserts that, as a matter of custom and usage in the securities industry, reverse repo participants relinquish all control over or legal interest in the securities during the term of the reverse repo agreement. This fact, the AMC Trustee contends, is wholly inconsistent with a secured loan characterization.
The Repo Committee and the FRBNY concur in the conclusion of the AMC Trustee that repo and reverse repo transactions, properly characterized, are contracts of purchase and sale. The FRBNY focuses on certain public policy considerations which it argues militate in favor of a purchase and sale characterization. In particular, the FRBNY asserts that the continued efficient functioning of the government securities markets depends on the liquidity and flexibility afforded investors by repo and reverse repo transactions. According to the FRBNY, structuring such transactions as purchases and sales serves two essential functions: (1) securities delivered under repo agreements remain freely transferable and unencumbered by restrictions from previous transfers, and (2) the Federal Reserve and other public entities which are subject to statutory or regulatory restrictions or prohibitions against lending and/or borrowing remain free to participate in the repurchase market.
The BBS, Inc. Trustee argues that the economic substance and not the form of the transactions at issue should govern the determination of the legal characterization of repo and reverse repo transactions. When viewed from this perspective, he contends that the transactions lack two critical elements of a true sale. First, according to the BBS, Inc. Trustee, there is no shift from the seller/borrower to the purchaser/lender of the risk associated with a potential decrease in the value of the underlying securities or of the expectation of benefit from any gain in the value of the securities. Any decline or appreciation in the value of the securities remains the loss or gain of the seller/borrower. Second, the BBS, Inc. Trustee asserts that the economic return on the securities, including interest (or, in the case of GNMA securities, *585 principal and interest) paid on the securities, remains with the seller/borrower.
The BBS, Inc. Trustee further cites a number of characteristics of the test case repo and reverse repo transactions which are typically associated with secured loans:
(1) The dealers and their counterparties priced the original transaction amount below the market value of the securities, thus providing an initial "haircut" or "cushion" for the benefit of the lender;
(2) The resale price was arrived at by adding to the original principal amount interest calculated at a fixed rate for the term of the transaction;
(3) The interest rate was negotiated at a rate which had no relationship to the interest rate of the underlying securities;
(4) In certain reverse repo transactions, the purchaser/lender (i.e., AMC or BBS, Inc.) had the right to "mark-to-market," that is, could demand additional security (margin) in the event of a decline in the market value of the underlying securities;
(5) In repo transactions, the seller/borrower (i.e., AMC or BBS, Inc.) customarily reserved the right to substitute securities;
(6) The obligation to resell or repurchase the securities was to take effect on a fixed maturity date; and
(7) Upon a failure of the seller/borrower (either AMC or BBS, Inc. in repo transactions or a reverse repo participant in reverse repo transactions) to repurchase the securities, the buyer/lender was entitled to sell the securities without notice, and was permitted to charge any loss to the seller/borrower.
The Reverse Repo Committee, SIPC, Fidelity and Prudential support the secured loan characterization advanced by the BBS, Inc. Trustee.
2. Applicable Law
The parties uniformly agree that the determination of the legal character of repo and reverse repo transactions and their respective property rights in the underlying securities is governed by state law. Section 541(a) of the Code provides that the debtor's estate includes all legal and equitable interests of the debtor in property, wherever located, or by whomever held, as of the commencement of the bankruptcy proceeding. 11 U.S.C. § 541(a). As stated in 4 Collier on Bankruptcy, ś 541.02(1) (15th Ed.):
Section 541 of the Code . . . provides a system for dealing with the debtor's interest in property and his debts. However, the existence and nature of the debtor's interest in property . . . are determined by non-bankruptcy law.
The Supreme Court in Butner v. United States, 440 U.S. 48, 54, 99 S.Ct. 914, 917, 59 L.Ed.2d 136 (1979) confirmed that "Congress has generally left the determination of property rights in the assets of a bankrupt's estate to state law." The Court further described the rationale for looking to state law for the determination of property rights:
Property interests are created and defined by state law. Unless some federal interest requires a different result, there is no reason why such interests should be analyzed differently simply because an interested party is involved in a bankruptcy proceeding. Uniform treatment of property interests in both state and federal courts within a state serves to reduce uncertainty, to discourage forum shopping, and to prevent a party from receiving `a windfall merely by reason of the happenstance of bankruptcy.' Lewis v. Manufacturers National Bank, 364 U.S. 603, 609 [81 S.Ct. 347, 350, 5 L.Ed.2d 323 (1961)]. The justifications for application of state law are not limited to ownership interests; they apply with equal force to security interests, including the interests of a mortgagee in rents earned by mortgaged property.
Id. at 55, 99 S.Ct. at 918.
The parties to the present motions and cross-motions argue that either the substantive law of New Jersey or New York should govern the legal characterization of repo and reverse repo transactions. In particular, *586 the Reverse Repo Committee flatly asserts that the determination of whether the test case transactions constitute a transfer of a security interest or the outright sale of securities is governed by Article 9 of the N.J.U.C.C., which applies to secured transactions. Such an argument, however, assumes the conclusion. As the Third Circuit noted in Major's Furniture Mart v. Castle Credit Corp., 602 F.2d 538, 542-43 (3d Cir.1979):
[W]hile the [U.C.C.] instructs us as to the consequences that ensue as a result of the determination of "secured indebtedness" as contrasted with "sale," the [U.C.C.] does not provide assistance in distinguishing between the character of such transactions. This determination, as to whether a particular assignment constitutes a sale or a transfer for security, is left to the courts for decision.
Such a determination therefore is made by reference to the common law of the appropriate state. The Reverse Repo Committee also contends that the economic substance of repo and reverse repo transactions is the only factor a court should consider. Neither the common law of New Jersey nor of New York support such a categorical assertion.
Under both New Jersey and New York law, contracts such as the repo and reverse repo agreements at issue here must be construed in accordance with the probable common intent of the parties. See, e.g., Kearny PBA Local No. 21 v. Town of Kearny, 81 N.J. 208, 221, 405 A.2d 393 (1979); Madawick Contracting Co. v. Travelers Insurance Co., 307 N.Y. 111, 119, 120 N.E.2d 520 (1954). Where the intention of the parties is clearly and unambiguously set forth in the agreement, effect must be given to the parties' intent as revealed in the language used without regard to extrinsic evidence. See, e.g., Midland Carpet Corp. v. Franklin Associated Properties, 90 N.J.Super. 42, 46, 216 A.2d 231 (A.D.1966); West, Weir & Bartel, Inc. v. Mary Carter Paint Co., 25 N.Y.2d 535, 307 N.Y.S.2d 449, 451-52, 255 N.E.2d 709, 711-12 (1969). The objective intent of the parties expressed or apparent in the writing controls the interpretation of a contract. Friedman v. Tappan Development Corp., 22 N.J. 523, 531, 126 A.2d 646 (1956); Hartford Accident & Indemnity Co. v. Wesolowski, 33 N.Y.2d 169, 171, 350 N.Y.S.2d 895, 305 N.E.2d 90 (1973). The undisclosed, subjective intent of the parties has no bearing on contract construction. Krosnowski v. Krosnowski, 22 N.J. 376, 386, 126 A.2d 182 (1956); In re Smith's Will, 254 N.Y. 283, 289, 172 N.E. 499 (1930). Furthermore, the words and phrases utilized in an agreement should be given their ordinary and familiar meaning. See, e.g., Independent Oil Workers at Paulsboro, N.J. v. Mobil Oil Corp., 441 F.2d 651, 653 (3d Cir.1971); Laba v. Carey, 29 N.Y.2d 302, 308, 327 N.Y.S.2d 613, 277 N.E.2d 641 (1971)
However, under both New York and New Jersey law, isolated words and phrases are not necessarily determinative of the meaning of the agreement, even if the meaning of these particular words and phrases is not subject to differing interpretation. As the New Jersey Supreme Court stated in Krosnowski:
A contract must be construed as a whole and the intention of the parties is to be collected from the entire instrument and not from detached portions. Individual clauses and particular words must be considered in connection with the rest of the agreement . . .
22 N.J. at 387, 126 A.2d 182; see also, Indovision Enterprizes, Inc. v. Cardinal Export Corporation, 44 A.D.2d 228, 354 N.Y.S.2d 113, 115 (A.D. 1st Dept. 1974). In Newark Publishers' Assn. v. Newark Typographical Union, 22 N.J. 419, 427, 126 A.2d 348 (1956), the Court further specified:
Disproportionate emphasis upon a word or clause or a single provision does not serve the purpose of interpretation. Words and phrases are not to be isolated but related to the context and the contractual scheme as a whole, and given the meaning that comports with the probable intent and purpose; and thus the *587 literal sense of terms may be qualified by the context.
See also, Empire Properties Corporation v. Manufacturers Trust Co., 288 N.Y. 242, 43 N.E.2d 25, 28 (1942).
In those cases where the express terms of an agreement are ambiguous, conflicting or unclear, and the intended meaning and operation of the contract can not reasonably be derived from the four corners of the writing, New Jersey and New York courts alike allow the introduction and examination of extrinsic evidence of intent as an aid in interpretation. Bedrock Foundations, Inc. v. Geo. H. Brewster & Son, Inc., 31 N.J. 124, 133, 155 A.2d 536 (1959); 67 Wall Street Co. v. Franklin National Bank, 37 N.Y.2d 245, 248-49, 371 N.Y.S.2d 915, 333 N.E.2d 184 (1975). In such cases, courts must necessarily consider "the relations of the parties, the attendant circumstances, and the objects they were trying to attain." Tessmar v. Grosner, 23 N.J. 193, 201, 128 A.2d 467 (1957); see also, Mister Filters v. Weber Environmental Systems, 44 A.D.2d 639, 353 N.Y.S.2d 835, 837 (A.D. 3d Dept. 1974). Among other extrinsic factors, New Jersey and New York courts have variously taken into account trade practices, and customs and meanings, Ace Stone, Inc. v. Wayne Township, 47 N.J. 431, 439, 221 A.2d 515 (1966); Mister Filters, supra, at 837 and subsequent conduct of the parties in performance of the agreement, Michaels v. Brookchester, Inc., 26 N.J. 379, 388 and 390, 140 A.2d 199 (1958); Studley v. National Fuel Gas Supply Corp., 485 N.Y.S.2d 880, 884 (A.D. 4th Dept. 1985).
3. Express Terms of Repo and Reverse Repo Transactions.
The express purchase and sale language contained in the repo and reverse repo agreements and the two confirmation slips issued by BBS, Inc. and AMC to its repo and reverse repo customers is described in the factual background portion of this opinion and need not be repeated here. The plain meaning of these terms can not seriously be disputed. Viewed in isolation, such terms reflect the objective intent of the parties to engage in purchase and sale transactions, and, absent other language in the transaction documents evidencing a contrary intent, the test case repo and reverse repo transactions would be given legal effect as such under New York and New Jersey law without reference to extrinsic evidence of intent.
While the transaction documents do not explicitly refer to the pledge of collateral securing a debt or other terms of art customarily found in security agreements or loan or pledge instruments, the BBS, Inc. Trustee and the Reverse Repo Committee argue that there is other language which casts doubt on whether the parties intended to engage in purchase and sale or secured loan transactions.[2] In particular, they note that the transaction documents contain terms normally found in credit transactions which are inconsistent with a purchase and sale construction.
First, the repurchase price designated in the repo and reverse repo agreements is the sum of the original "purchase price" or principal loan amount plus interest on that amount calculated at a fixed rate through the date of repurchase. The interest rate is a market rate that bears no relation to the interest rate of the underlying security. The payment of interest on principal and the existence of a maturity date are characteristics typically associated with loan transactions. However, the same characteristics are also present in other transactions which unquestionably involve the purchase and sale of securities. For example, the yield on investments in Treasury securities (which are widely characterized as government debt obligations) is based on a fixed market rate of interest payable up to *588 a predetermined maturity date, at which time the principal amount of the securities is redeemable by the holder of the securities. Yet the acquisition of such securities on the retail market is universally recognized as a purchase through which investors attain a freely transferable ownership interest. Certainly, the mere calculation of the yield on an investment by reference to a fixed rate of interest payable up to a date certain is not necessarily inconsistent with a purchase and sale.
Second, on the maturity of the repo or reverse repo transaction, the buyer/lender must return the same underlying security to the seller/borrower in exchange for the repurchase amount. Meiselman Rep. at 4 ("buyer/lender must return the same securities . . . and may not substitute a different security even if it is of equivalent value"). The Repo Committee and the FRBNY disagree with this contention and argue that the obligation to resell requires only the return of similar or equivalent securities of the same class, issue and value. See, e.g., Goldman Rep. at 28; Pugh Rep. at 4; Pugh Dep. at 81-84 (during which he qualified but did not abandon his position that the return of equivalent securities is permissible under repo and reverse repo transactions).
Even assuming that the agreements require the return of identical securities, it is unclear why the Reverse Repo Committee believes this fact distinguishes repo and reverse repo transactions as secured loans. Indeed, under § 9-207(2)(d) of the U.C.C. a secured party is allowed to commingle fungible collateral, including certain types of securities, and may sell the collateral and replace it with instruments which are equivalent in kind and value without breaching his duty to exercise reasonable care in the custody and preservation of the pledged collateral. See N.J.S.A. 12A:9-207(2)(d); N.J.S.A. 12A:1-201(17) (securities are "fungible" if they are, "by nature or usage of trade, the equivalent of any other like unit"); Fedders Corp. v. Taylor, 473 F.Supp. 961, 974 (D.Minn.1979).
Third, upon the failure of the seller/buyer to repurchase the securities on the maturity date of a repo or reverse repo transaction, the buyer/lender may sell the securities without notice and for the best price possible. This term in the repo and reverse repo agreements also does not provide a factual basis for favoring a secured loan characterization over a purchase and sale characterization. Rather, this language merely sets forth the legal consequences of both a breach of a purchase and sale contract whereby the seller is released from his obligation to sell and is correspondingly entitled to dispose of the contracted goods in a commercially reasonable manner upon reasonable notice to the breaching buyer, see, e.g., N.J.S.A. 12A:2-706, as well as a default on a loan secured by pledged collateral whereby the secured creditor is similarly entitled to dispose of the collateral upon notice to the defaulting debtor. N.J.S.A. 12A:9-504. The "without notice" phrase is equally ineffective under either characterization.
Fourth, the seller/borrower retains coupon interest. The BBS, Inc. Trustee and the Reverse Repo Committee point to this term as evidence that one critical indicia of ownership, i.e., the economic return on the securities, did not pass to the purported "buyers" as would customarily occur in a true sale. The Repo Committee contends that this provision is not applicable to the test case repo and reverse repo transactions because the securities involved in these transactions did not bear interest coupons. Such a narrow reading of this provision is entirely inappropriate. Those experts who have expressed an opinion on the scope of this provision, including the expert retained by the Repo Committee, have agreed that it applies equally to "pass through" payments of interest and principal (with respect to GNMA securities) and to fixed amounts of interest paid every six months on other securities. Landon Aff. ś 8; Goldman Dep., pp. 169-70, 173-74; Geiger Dep., pp. 102-04. Furthermore, in the four AMC reverse repo transactions involving GNMA securities, the reverse repo participants, and not AMC or the repo *589 participants, received principal and interest payments on the underlying securities until AMC filed for bankruptcy. Bryan E. Green Aff., ś 7(g); Johnson Aff., ś 7(g); Morris Aff., ś 7(f); Mulligan Aff., ś 7(g). There is no question that retention of principal and/or interest payments by a seller/borrower is a common feature of collateralized loans. See N.J.S.A. 12A:9-207(2)(c) (profits derived from pledged collateral in the form of money must either be remitted to debtor or applied to reduce the secured obligation).
Fifth, in reverse repo agreements only, the purchaser/lender is given the right to request additional margin any time during the life of the agreement. As in a typical collateralized loan, this "mark-to-market" provision entitled AMC or BBS, Inc. to request additional collateral from reverse repo participants in order to maintain an adequate level or margin in the event the underlying securities decline in value. The BBS, Inc. Trustee and the Reverse Repo Committee contend that this provision demonstrates that the seller/borrower continues to bear the risks relating to market fluctuations despite the purported "sale" of the securities.
Lastly, under the express terms of repo agreements only, AMC and BBS, Inc. had the "right of substitution." The meaning and scope of this right are matters of considerable factual dispute between the parties. The parties agree that a right of substitution permits the seller/borrower to replace the securities underlying a repo transaction with alternative securities. They disagree, however, as to whether this right is exercisable in possessory and non-possessory (custody) repo transactions alike and whether replacement of the underlying securities is limited to securities of the same issue.
Clifford Goldman, the expert retained by the Repo Committee, emphasized in his report and deposition testimony that dealers reserve a right to substitute securities in order to maintain control over their securities inventories and thereby retain the flexibility they require to effectively and efficiently operate in the repo market. Goldman Rep. at 26; Goldman Dep. at 220. These same concerns would not extend to securities delivered to repo participants in possessory repo transactions. Furthermore, as will be discussed below in greater depth, an essential element of repo and reverse repo transactions is the free transferability of the underlying securities. As the Second Circuit noted in SEC v. Drysdale, 785 F.2d 38, 41 (2d Cir.1986), the purchaser/lenders in repo and reverse repo transactions are free to "trade, sell or pledge" the securities. If the dealer's right of substitution is construed to apply to securities transferred in possessory repo transactions, then the ability of the repo participant to exercise his right to deal in the securities would be compromised.
The Repo Committee contends that the right of substitution is limited to securities of the same issue, class and maturity and in the same face amount as the original securities. In support of this contention, the Committee relies, in part, on SEC v. Miller, 495 F.Supp. 465 (S.D.N.Y.1980), in which the court interpreted the right of substitution to mean that a dealer "may substitute different securities of the same issue." This interpretation, however, does not square with the record in these adversary proceedings. Several industry experts have stated in their reports that the right of substitution extends to securities of like kind or quality and of equal or greater value. Stigum Rep., pp. 72, 84-85; Goldman Rep., pp. 4, 25-26. Indeed, in one of its repo transactions with Champlain, BBS, Inc. substituted two GNMA securities and two securities issued by the Federal Home Loan Mortgage Corp. for one GNMA security. King Aff., 4/21/85, śś 12-15. Mr. Goldman acknowledged in his deposition testimony that the right of substitution is important to dealers, in part, because it gives them the continuing ability to respond to market fluctuations in the value of securities they are carrying in inventory, including securities sold to repo participants in non-possessory repo transactions. Goldman Dep., pp. 220-221. However, a dealer's ability to capture market *590 appreciation or minimize market losses on securities which increase or decrease in value during the term of a non-possessory repo transaction would be effectively undermined if substitution were limited to securities of the same class, issue, maturity and value. The record in these test cases supports a conclusion that the express right of substitution contained in the Repo Agreements entitled AMC and BBS, Inc. to substitute securities of equivalent value and quality for securities over which they retained possession or control during the term of custody repo transactions. The BBS, Inc. Trustee and the Reverse Repo Committee note that any such right of substitution customarily would not be present in an outright purchase and sale of securities.
As the preceding discussion reveals, repo and reverse repo agreements contain terms which are not typically found in the outright purchase and sale of securities. The reality, of course, is that repo and reverse repo transactions are not straight-forward purchase and sale transactions, and no party to the present motions and cross-motions contends that they are. In the usual one-way purchase and sale of securities, the seller's interest in the underlying securities is extinguished upon the transfer of the securities against payment. In repo and reverse repo transactions, however, the seller of the securities contemporaneously agrees to reacquire the securities on a specified future date. The parties to repo and reverse repo transactions therefore remain subject to market and credit risks which are not present in one-way purchase and sale transactions. The seller necessarily retains an interest in what happens to the value of the securities he is contractually obligated to reacquire. To the extent that the buyer continues to trade in the securities prior to the repurchase date, he remains subject to market fluctuations in their value. In addition, as in any purchase and sale contract, the original buyer is subject to the risk that the counter-party (the original seller) will fail to perform on his obligation to repurchase the securities, and is further subject to the market risk that the value of the securities will have decreased in the interim to below the agreed repurchase price.
In order to protect themselves against the additional market and credit risks associated with repo and reverse repo transactions, dealers such as AMC and BBS, Inc., in particular, have negotiated terms to the repo and reverse repo agreements which are typically found in secured loan transactions. Certain of these terms are not uniformly applied to both repo and reverse repo transactions. For example, the right of substitution was only extended to AMC and BBS, Inc., as sellers in repo transactions and provided them with some protection against the risk of market fluctuations in the value of the underlying securities prior to the date they were obligated to repurchase them. The right to request additional margin is similarly only given to AMC and BBS, Inc. as buyers in their reverse repo transactions and provided them with some protection against the risk that the reverse repo participants would default on their obligation to reacquire the securities. Apparently, the repo and reverse repo participants were willing to extend these protections to the dealers without insisting on the same protections for themselves.
The selective inclusion in the repo and reverse repo agreements of terms customarily found in secured loan transactions does not automatically convert them into secured loan instruments and does not nullify the express language of purchase and sale which the parties have voluntarily chosen to describe the transactions. However, the presence of these terms in the agreements does raise sufficient doubts as to the intent of the parties to justify examination of extrinsic evidence of intent.
4. Extrinsic Evidence of Intent
a. Books and Records of the Parties
As with the express terms of repo and reverse repo agreements and the accompanying confirmations, support for either a secured loan or purchase and sale characterization *591 can be found in the books and records of the parties to the test case transactions.
The operating records of AMC and BBS, Inc. generally carried repo transactions as sales. The "Stock Record Position List" of AMC and BBS, Inc. documented repo transactions in the same manner as outright purchases and sales, and recorded the repo participant's holding of the security as "long" (meaning full ownership). Landon Dep. at 94-95, 98; Stigum Rep. at 111 ("a trader who buys securities outright is said to have a long position in those securities"). In addition, the dealers' DEX instructions to SPCSC identified the described securities as having been sold to the named repo participant. Landon Dep. at 76-77. On the other hand, the trade tickets generated by AMC and BBS, Inc. refer to the original purchase price of the securities in repo and reverse repo transactions as "$'s financed" and the "rate" and amount of "interest" to be paid on the repurchase price. See, e.g., Landon Aff., Exh. 12.
As will be discussed below, the accounting treatment accorded repo and reverse repo transactions by AMC and BBS, Inc. conformed with generally accepted accounting principles ("GAAP") recommended in the AICPA Audit and Accounting Guide. AMC carried its repo and reverse repo agreements in accounts denominated "repo payables" and "reverse repo receivables." Huber Aff., śś 7-11. In its annual balance sheets, BBS, Inc. similarly recorded agreements to repurchase securities pursuant to repo transactions as liabilities and agreements to resell securities pursuant to reverse repo transactions as assets carried at the original contract price plus accrued interest receivable from reverse repo participants on the maturity dates of the transactions. Manley Rep., pp. 1-2.
The BBS, Inc. Trustee and the Reverse Repo Committee argue that the accounting practices of the dealers are consistent with treatment of repo and reverse repo transactions as secured loans. However, these practices are not necessarily inconsistent with purchase and sale treatment. Securities sold to repo participants were not carried on the dealers' books as assets at market value as would be expected if such transactions were accounted for as secured loans. See, e.g., Wallace Aff., ś 3 and Exh. A. Rather, the dealers' treatment of reverse repos as accounts receivable is merely descriptive of the fact that their reverse repo customers had a contractual obligation to pay the dealers a sum certain in return for the reconveyance of securities. Similarly, their treatment of repos as accounts payable accurately reflects that the dealers were contractually obligated to pay the repo participants a sum certain to reacquire securities.
The reverse repo participants in the AMC test cases accounted for the transactions as short-term borrowings and accordingly carried the underlying securities on their books as assets at either market value or cost and recorded the interest due on the closing date of the transactions as an interest expense. See, e.g., Johnson Aff., ś 3; Wallace Aff., ś 3.
b. Accounting Conventions
Treatment of repo and reverse repo agreements by the accounting profession varies to suit the needs of particular clients, and GAAP differ depending upon the nature of the entity subject to audit. Thus, broker/dealers and commercial banks account for repo agreements as liabilities under the caption "securities sold under agreements to repurchase" and reverse repo agreements as receivables carried as assets under the caption "securities purchased under agreements to resell." Perry Rep., p. 1. State and local government units consider repo and reverse repo transactions to be purchases and sales and account for them as short-term investments. Perry Rep., p. 5 & 6. GAAP require that Savings and Loan Associations account for reverse repo transactions as financing transactions similar to broker/dealers and commercial banks. However, there are no GAAP with respect to repo transactions engaged in by saving and *592 loan associations. Perry Rep., p. 2. Thus, parties to a repo or reverse repo transaction might account for these transactions in different ways consistent with GAAP. Manley Rep., pp. 136-37.
c. Regulatory Treatment of Repo and Reverse Repo Transactions
Regulatory agencies similarly treat repo and reverse repo transactions differently depending upon the regulatory function they are performing and the context within which they are acting. For example, with regard to the Investment Company Act of 1940, which was enacted to regulate borrowings by registered investment companies, the SEC considers reverse repo transactions as loans to the investment companies by the counter-parties which are collateralized by securities. Investment Company Act Rel. No. 10666, 44 Fed.Reg. 25128, 25129 (April 27, 1979). For purposes of the federal securities laws, however, the SEC regards repo and reverse repo transactions to be purchases and sales. 46 Fed.Reg. 48637 (October 2, 1981).
Similarly, the Federal Reserve requires a "federal fund transaction" to be treated as a transaction involving "a loan on the part of a `selling' bank and a borrowing on the part of the `purchasing' bank." 12 C.F.R. § 250.160 (1985). Federal funds transactions, except for the fact that they are unsecured, are functionally identical to repo transactions. SEC v. Miller, 495 F.Supp. at 469. However, in these proceedings, the FRBNY has taken the unequivocal position that repo and reverse repo transactions are structured and should be given legal effect as purchases and sales. Sternlight Aff., śś 5 and 9.
d. Trade Custom and Usage
As noted in the factual background portion of this opinion, the repurchase market in government and agency securities has evolved into one of the largest and most important securities markets in the United States. Repo and Reverse Repo transactions have become such attractive investment vehicles largely because they allow counterparties to achieve short-term management, financing and investment objectives with a high degree of liquidity and flexibility. See, e.g., Goldman Rep., pp. 5-6. There is no dispute in these proceedings that the stability and continued vitality of the repurchase market depends upon the free transferability of the securities underlying the transactions. See, e.g., Sternlight Aff., ś 3 ("an essential feature of this arrangement is that securities delivered under a repurchase agreement are freely transferable and unencumbered by restriction from previous transfers").
As a matter of custom and usage in the securities industry, securities dealers such as AMC and BBS, Inc. do not ordinarily hold securities acquired through a reverse repo agreement to the maturity date of the transaction. Pugh Aff., ś 5. Dealers routinely transfer the securities to third parties in matched repo transactions or to make good delivery of securities they have sold outright, but did not own (i.e., to cover short positions). Goldman Rep., pp. 28-29; Stigum Rep., p. 36, 90-92. The third parties are entitled to take possession of the securities and may in turn engage in additional transactions with them. There is theoretically no limit to the number of transactions to which a security may become subject after it is acquired by a dealer under a reverse repo transaction.
In view of the need to assure the continued free transferability of the underlying securities, repo and reverse repo agreements customarily contain no restrictions on the purchasers' right to transfer or encumber the securities, subject only to their contractual obligation to return the same security on the closing date of the transaction. Pugh Aff., śś 4-5; Stigum Rep., p. 74. As the Second Circuit observed in the Drysdale case:
[R]epo "lenders" [purchasers] take title to the securities received and can trade, sell or pledge them. The repo merely imposes a contractual obligation to deliver identical securities on the settlement date set by the repo contract . . . [Tlhe *593 secured "lender" [purchaser] is free to deal the "collateral."
785 F.2d at 41.
Various parties to the present motions and cross-motions contend that the terms of purchase and sale contained in repo and reverse repo agreements are not merely arbitrary labels. Rather, they argue that repo and reverse repo transactions are deliberately structured as purchases and sales as a matter of industry custom and practice in order to assure the free transferability of the underlying securities. Peter D. Sternlight, Executive Vice President of the FRBNY, stated in his affidavit:
[Repo and reverse repo transactions] are structured and treated as sales and repurchases unencumbered by any restriction from prior transfer that would impede further transfer. This treatment is essential to the purposes for which repurchase agreements are employed: high-volume, short-term financing transactions.
Id., ś 9. In its reply brief to the Second Circuit in the Drysdale case, the SEC set forth its similar understanding as to industry custom and practice:
Repos and reverse repos are deliberately structured as purchases and sales of securities â not secured loans â for a variety of reasons unrelated to the `borrowing limitations imposed upon banks and financial institutions' . . . [S]uch a structure is essential to ensure quick and inexpensive execution of these transactions â a feature essential to the very existence of the repo market â . . .
Appendix to Repo Committee Brief, pp. A580-581.
The Reverse Repo Committee contends that a secured loan characterization would not adversely affect the transferability of securities underlying repo and reverse repo transactions. The Committee argues that securities are equally transferable under either a secured loan or purchase and sale label. The Committee correctly points out that securities pledged as collateral for a loan can be re-pledged by the secured lender pursuant to Section 9-207(2) of the New Jersey or New York U.C.C., which provides in relevant part:
Unless otherwise agreed, when collateral is in the secured party's possession . . . (e) the secured party may repledge the collateral upon terms which do not impair the debtor's right to redeem it.
However, if securities transferred pursuant to a repo or reverse repo transaction were construed to be pledged collateral, then the ability of the purchaser of the securities to freely trade in them would necessarily be limited.
A secured party assumes a duty to exercise reasonable care in the custody and preservation of collateral in his possession. See, e.g., N.J.S.A. 12A:9-207(1). A repledgee of the collateral owes the same duty of care to the original pledgor. See, e.g., Grace v. Sterling, Grace & Co., 289 N.Y.S.2d 632, 638-39 (A.D. 1st. Dept. 1968). Although the scope of this duty depends upon the facts and circumstances of the particular secured transaction, investors interested in entering the repurchase market may be unwilling to assume such a duty and the attendant risks of liability. More importantly, Section 9-207(2)(e) is applicable only to situations where a secured party repledges collateral to a third party as security for his own obligation, or grants a security interest in the pledged collateral. Id. at 639. By definition, the right to repledge collateral under this section does not give the secured party the right to sell the collateral outright (absent the pledgor's default on his obligation) or engage in other investment activity intended solely to generate a profit for the secured party. Section 9-207(4) permits the use of pledged collateral only for "the purpose of preserving the collateral or its value," and, absent an agreement to the contrary, the secured party may be accountable to the debtor for any profits generated by the secured party's use of the collateral. Section 9-207(2)(c); see also Hawkland, Lord & Lewis, UCC Series, § 9-207:01, p. 549. As the Second Circuit stated in Drysdale:
[Defendant] ignores a most significant difference between repos and standard *594 collateralized loans . . . In the latter transaction the lender holds pledged collateral for security and may not sell it in the absence of a default. In contrast, repo "lenders" take title to the securities received and can trade, sell or pledge them.
785 F.2d at 41 (emphasis added); see also, 69 Am Jur 2d, Secured Transactions, §§ 237 & 240.
5. Decisional Law
The cases which have addressed the legal characterization of repo and reverse repo transactions can be divided into three broad categories: tax cases, securities fraud cases, and bankruptcy cases. The vast majority of these cases are inapposite either because they involve commercial transactions which are factually distinguishable in certain vital respects from the repo and reverse repo transactions which are the subject of these test cases, or because the courts chose to characterize the transactions in a particular way for reasons which have no bearing on the analysis required in these proceedings.
a. Tax Cases â In support of their argument that repo and reverse repo transactions are secured loans and not purchases and sales, the BBS, Inc. Trustee and the Reverse Repo Committee cite to a number of decisions construing the federal tax consequences of certain oral arrangements between commercial banks and municipal bond dealers which the courts described as repurchase agreements. Union Planters National Bank of Memphis v. United States, 426 F.2d 115 (6th Cir.1970); American National Bank of Austin v. United States, 421 F.2d 442 (5th Cir.1970): First American National Bank of Nashville v. United States, 467 F.2d 1098, 1101 (6th Cir.1972). In each of these cases, the courts refused to treat purported purchases and sales as such for federal tax purposes. However, the transactions at issue in these cases involved financing arrangements between the banks and the bond dealers to enable the dealers to market tax exempt municipal bonds to their customers. These arrangements bear little or no resemblance to the traditional repo and reverse repo transactions at issue in these proceedings. Furthermore, the courts noted that the parties' intent underlying their contractual relations was not relevant to the legal characterization of the transactions for federal income tax purposes. See, Union Planters, 426 F.2d at 117; American National, 421 F.2d at 451. Rather, the courts were concerned with the tax avoidance possibilities associated with the transactions and focused their attention solely on their economic substance. See e.g., Union Planters, 426 F.2d at 116 & 118 ("if the parties' characterization of these transactions is accepted as decisive for federal income tax purposes, they would be able to enjoy the benefit of the double tax advantage which Congress intended to prevent").
In the present test cases, the intent of the parties is a central consideration in determining their property interests in the securities underlying the repo and reverse repo transactions under applicable state law. Considerations relating to the economic substance of the transactions, while relevant to this determination, are certainly not controlling.
b. Securities Fraud Cases â The clear trend in cases brought under Section 10(b) of the Securities and Exchange Act of 1934 has been to treat repo and reverse repo transactions as "purchases and sales" of securities for purposes of applying the antifraud provisions of the Act. See, SEC v. Gomez, CCH Fed.Sec.L.Rep. ś 92,013 (S.D. Fla.1985) [Available on WESTLAW, DCTU database]; City of Harrisburg v. Bradford Trust Co., 621 F.Supp. 463 (M.D.Pa.1985); SEC v. Miller, 495 F.Supp. 465 (S.D.N.Y. 1980) (court noted in dictum that "[f]rom a purely economic perspective, a repo is essentially a short-term collateralized loan", yet proceeded to find a § 10(b) violation). However, certain of the considerations which govern the proper characterization of repo and reverse repo transactions under Section 10(b) are not relevant to the analysis which must be applied in deciding the present motions and cross-motions.
*595 Under Section 10(b), the terms "purchase" and "sale" are to be broadly construed to effectuate the remedial purpose of the Securities and Exchange Act. First National Bank of Las Vegas v. Estate of Russell, 657 F.2d 668, 673 (5th Cir.1981). In determining whether a transaction is a sale, courts examine such factors as whether the transaction affects the securities industry, and whether application of Section 10(b) of the Act and Rule 10(b)-5 to the transaction would advance the purposes of the Act. Id. at 676. Indeed, the "pledge" of securities has been held to be a "purchase or sale" of securities for the purposes of the federal securities laws. Rubin v. United States, 449 U.S. 424, 428-30, 101 S.Ct. 698, 700-01, 66 L.Ed.2d 633 (1981).
The recent decision of the Second Circuit in Drysdale, however, contains language which does have a direct bearing on the characterization issue central to the present motions and cross-motions. The issue before the Drysdale court was whether misrepresentations regarding a government securities dealer's solvency had been made "in connection with" repo and reverse repo transactions. In concluding that the misrepresentations of the dealer's financial health were closely linked to the transfer of securities in repo and reverse repo transactions, the court explicitly distinguished between standard collateralized loans and transactions in the repurchase market. In particular, the court noted that a purchaser of securities in a repo or reverse repo transaction takes title to the securities and is free to trade, sell or pledge them during the term of the transaction, whereas a lender in a secured loan transaction may not sell the collateral in the absence of a default. This difference, the court observed, has a direct impact on a dealer's ability to fulfill its contractual obligation to repurchase or resell securities:
[I]n a reverse repo, [defendant's] ability to honor its obligation to resell securities depended upon its financial health since its common practice, like that of typical government securities dealers, was to sell immediately the securities received in a reverse repo either for cash or in another repo. Thus, in order to resell the securities upon settlement date of a reverse repo, [defendant] had to purchase identical securities, something which its insolvency may have rendered impossible. Even if it did not resell immediately, the securities held by [defendant] were [defendant's] assets available for satisfaction of its debts and thus could be seized by creditors, an eventuality directly related to [defendant's] financial condition.
785 F.2d at 42. This language unarguably reflects a view of repo and reverse repo transactions as having the legal effect in commercial and securities market contexts of a purchase and sale.
c. Bankruptcy Cases â The characterization of repo agreements was the central issue in three bankruptcy-related cases in which the courts were required to determine whether the buyers of securities in repo transactions were entitled to liquidate the securities upon the failure of the bankrupt sellers to repurchase them, and thereafter retain sale proceeds in excess of the agreed repurchase price or recover any deficiency from the bankrupt sellers. In re Financial Corp. (Walters v. Occidental Petroleum Corp.), 1 B.R. 522 (W.D.Mo. 1979), aff'd. sub. nom., Financial Corp. v. Occidental Petroleum Corp., 634 F.2d 404 (8th Cir.1980); Gilmore v. State Board of Administration of Florida, 382 So.2d 861 (Fla.App.1980); In re Lombard-Wall, No. 82-B-11556, bench op. (S.D.N.Y. Sept. 16, 1982).
The principal issue in Financial Corp. was whether a repo agreement created an "option" in the seller to repurchase rather than an "obligation" to do so. The court concluded that the seller was contractually obligated to repurchase the securities, and the buyer's bankruptcy claim for damages resulting from the bankrupt seller's breach of its repurchase obligation was valid. In so holding, the court rejected the argument than an obligation to repurchase would cause the repo agreement to be governed by Article 9 of the U.C.C.:

*596 While this repurchase agreement had many attributes of a secured loan, there was nothing in the record to indicate that this transaction was intended to effectuate a security interest.
1 B.R. at 526, n. 7.
The Gilmore case is more directly on point. In Gilmore, a bankrupt corporation defaulted on its obligation to repurchase securities which were the subject of a possessory repo transaction with the defendant. Arguing that repo agreements are collateralized loans, the Trustee of the bankrupt seller sought to recover from the defendant buyer proceeds from the sale of the securities in excess of the repurchase price. The appellate court upheld a trial court determination that "the evidence showed two transactions, an actual purchase and sale of securities with minor characteristics of a secured loan, and a simultaneous but separate agreement to repurchase and resell similar securities on specific terms." In finding against the Trustee, the court relied in part on industry custom and usage:
[U]nder the parties' agreement the [buyer] had the right to sell the original securities at any time after acquiring them from [the seller] without accountability for sale proceeds, subject only to its obligation to offer like securities for repurchase by the [original seller] under the terms specified by the agreement.
382 So.2d at 863.
In contrast to the Financial Corp. and Gilmore decisions, Judge Ryan, in his 1982 bench opinion in Lombard-Wall, concluded that the repurchase transaction in that case was a secured loan for bankruptcy purposes. The detailed eight page repo agreement at issue in Lombard-Wall, however, differed in certain critical respects from traditional repo agreements, such as those which are the subject of the present test cases. See Stigum Rep., Appendix II. In particular, the repo purchaser in Lombard-Wall was not entitled to possession of the underlying securities, and had no right to deal with them in any way during the term of the agreement. Rather, the purchased securities were to be held in trust by a bank trustee until they were repurchased by Lombard-Wall pursuant to the repurchase agreement. Such restrictions on the free transferability of repo securities is contrary to standard industry practice.
Under the Lombard-Wall ruling, the automatic stay provisions of the Code would bar a repo purchaser from liquidating the securities in the event a seller of securities in a possessory repo transaction filed for bankruptcy prior to the agreed repurchase date. The decision aroused considerable concern in the securities industry over the continued liquidity and safety of the repurchase market, and prompted Congress to enact § 559 of the Code. See generally, Bankruptcy Reform: Hearing before the Subcommittee on Courts of the Senate Committee on the Judiciary, 98th Cong., 1st Sess. 304 (1983). Section 559 effectively neutralized the legal consequences of the Lombard-Wall decision. Purchasers of securities in repo transactions are granted the right to liquidate the securities immediately upon a seller's bankruptcy. Any proceeds from the sale of the securities in excess of the agreed repurchase price are deemed property of the estate.
Passage of Section 559 reflects legislative treatment of repo transactions in the bankruptcy context which conforms with market practice and expectations. The repo securities are not treated as collateral for a secured loan, leaving the buyer free to liquidate the securities free of any lien or encumbrance from a previous holder. On the other hand, the buyer's obligation to reconvey the securities to the seller is acknowledged in the requirement that excess proceeds be remitted to the estate of the bankrupt counterparty. Thus, repo transactions are not treated as secured loans, nor are they treated as outright, unconditional sales.
6. Conclusion
The foregoing discussion leads to one inescapable conclusion: repos and reverse repos are hybrid transactions which do not fit neatly into either a secured loan or *597 purchase and sale classification. There is no question that repo and reverse repo transactions have functional attributes which resemble collateralized loans. The initial taking of margin (the "haircut"), the right of substitution, and the "mark-to-market" provisions are undeniably secured loan characteristics not commonly found in purchase and sale transactions. In addition, principal and/or interest paid on the underlying securities remains the property of the seller. On the other hand, the repo buyer's unrestricted right to trade the securities during the term of the agreement represents an incident of ownership which does not pass to a secured lender in a collateralized loan transaction. Furthermore, while the risk of market fluctuations in the value of the underlying securities ultimately rests with the original seller, this truism is of no legal consequence. The seller's interest in the market value of the securities is no greater in a secured loan transaction where he retains beneficial ownership of the securities than in a purchase and sale transaction where he is contractually bound to reacquire ownership of them. Clearly, any attempt to determine whether a repo or reverse repo transaction is more like a secured loan than a purchase and sale by weighing economic factors on a finely tuned balance scale would be an essentially formalistic and ultimately unproductive exercise.
In any event, the proper characterization of repo and reverse repo agreements does not rest solely on an evaluation of the economic substance of the individual transactions. Rather, the intent of the parties viewed in the context of the entire market in which these transactions take place is the controlling consideration under both New York and New Jersey law. This intent must be gleaned from the express terms employed in the transaction documents as well as relevant extrinsic evidence of intent, including trade custom and usage, market realities and the parties' course of conduct and performance. See, e.g., N.J.S.A. 12A:1-205(3) and (4); N.J.S.A. 12A:2-208(2).
The unequivocal language of purchase and sale in the repo and reverse repo agreements at issue in these test cases is strong prima facie evidence that the parties intended the transactions to be treated accordingly. As a general rule, "[w]hen a man uses words which have a given legal effect he is bound by that effect in the absence of fraud or mistake" or conclusive evidence that he and his counterparty shared a contrary intent and thus did not mean what they said. See, Dura Electric Lamp Co. v. Westinghouse Electric Corp., 249 F.2d 5, 7 (3d Cir.1957). None of the factors which might otherwise invalidate or overcome the purchase and sale language in the test case repo and reverse repo agreements are present here.
While there are substantial allegations of fraud and other illegal conduct which are the subject of other proceedings in the AMC and BBS, Inc. bankruptcy cases, there has been no suggestion that the parties to these test cases were wrongfully induced or coerced into adopting the purchase and sale language contained in the subject repo and reverse repo agreements. Nor is there any evidence that the parties to these agreements were in positions of unequal bargaining power. The repo and reverse repo customers of AMC and BBS, Inc. were thift institutions, other corporate entities and municipal governments who presumably were not strangers to complex financing and investment transactions. Rather, they were relatively sophisticated investors whose investment options were not limited to transactions in the repurchase markets. Having voluntarily chosen to enter the repurchase market in government and agency securities, their choice of counterparties similarly was not limited to AMC or BBS, Inc. The repurchase market is a highly competitive market in which an estimated 200 or more secondary dealers are actively engaged. As Mr. Goldman noted in his expert report, the number of "secondary as well as primary dealers is advantageous to investors because it provides them with a greater choice of firms and services." Goldman Rep., p. 14. The test case transactions simply cannot be *598 compared with those situations where a court might strive to extricate an uninformed or inexperienced layman with limited resources from the consequences of an improvident contractual agreement.
The mere presence of secured loan characteristics in repo and reverse repo agreements is not enough to negate the parties' voluntary decision to structure the transactions as purchases and sales. There is nothing in Article 2 of the U.C.C. governing sales which would preclude parties from incorporating terms which are common features of collateralized loans into agreements which otherwise have legitimate attributes of a purchase and sale. See, e.g., N.J.S.A. 12A:2-102, New Jersey Study Comment, n. 2. As the SEC persuasively argued in the Drysdale case:
That the parties to these transactions have expressly chosen to treat them as purchases and sales of securities is a fact entitled to substantial weight and should not be casually discounted merely because these transactions may be viewed from "an economic perspective" as a secured loan.
Repo Committee Brief, Appendix, p. A581.
Under Section 1-205 of the U.C.C., "any usage of trade in the vocation or trade in which [the parties] are engaged or of which they are or should be aware give particular meaning to and supplement or qualify terms of an agreement." See, e.g., N.J.S.A. 12A:1-205(3). Furthermore, "the express terms of an agreement and . . . usage of trade shall be construed wherever reasonable as consistent with each other." See, e.g., N.J.S.A. 12A:1-205(4). The express language of purchase and sale contained in the test case repo and reverse repo agreements is entirely consistent with the practices and expectations of the securities industry. The repurchase market is a large and highly evolved market which is uniquely structured to meet the short-term liquidity, financing and investment needs and objectives of particular entities. The purchase and sale format for repo and reverse repo transactions adopted throughout the industry is an integral part of this structure, and serves a vital market function by assuring that the securities underlying the transactions remain freely and easily transferable. The unequivocal purchase and sale language in the AMC and BBS, Inc. repo and reverse repo agreements is compelling evidence that the parties intended their transactions to be conducted in conformity with standard industry customs and practices.
There is an ever present need for certainty and predictability in commercial transactions of any sort. To ignore the voluntary decision of contracting parties to structure their transactions in a particular manner, and to disregard widely recognized and accepted industry practices would only foster confusion within the repurchase market over the legal consequences of engaging in repo and reverse repo transactions.
I conclude that the repo and reverse repo agreements which are the subject of the present test cases are contracts for the sale of securities and their resale back to the original seller at a future date, and should be given legal effect as such.
B. Customer Status Under SIPA
The BBS, Inc. Trustee and SIPC contend that repo and reverse repo participants are not "customers" under SIPA, that they therefore are not entitled to the protections afforded to "customers" under SIPA, and that the securities they claim are not "customer property," but rather are part of the general estate. In support of these contentions, the Trustee and SIPC rely in large measure upon passages in the legislative history of SIPA and case law which state that lenders of cash and/or securities to a bankrupt dealer are not "customers" entitled to SIPA protection. See, e.g., Securities Investor Protection Act Amendments of 1978: Hearings before the Subcomm. of the Comm. on Banking, Housing and Urban Affairs, 95th Cong., 2d Sess. (1978) (Statement of Hon. Hugh F. Owens, Chairman, SIPC) ("customer status should not be extended to lenders of securities to the debtor where such lenders have received either collateral or consideration for their *599 loans"); In re Hanover Square Securities, 55 B.R. 235, 239-40 (Bankr.S.D.N.Y.1985) ("lenders to a broker-dealer, be they gratuitous or compensated, subordinated or unsubordinated, are not customers . . . within the meaning of SIPA") (original emphasis). It is unnecessary to decide whether there is a blanket rule that parties involved in lending transactions with broker-dealers are per se not customers. I have already concluded that the repo and reverse repo transactions at issue in these test cases were purchase and sale transactions for bankruptcy and commercial law purposes. The legislative history and cases relied upon by the Trustee and SIPC do not require a different characterization for SIPA purposes. In any event, the BBS, Inc. Trustee and SIPC contend that repo and reverse repo participants should be denied "customer" status regardless of whether repo and reverse repo transactions are construed as a matter of law to be purchases and sales or secured loans for bankruptcy and commercial law purposes.
Customer status under SIPA is a preferred status and customers are entitled to certain protections which are not available to general creditors of the bankrupt debtor. "Customers" are entitled to a pro rata share of the fund of "customer property," which is comprised of all cash and securities received, acquired or held by or for the account of a broker for its "customers." 15 U.S.C. § 78111(4); see also, 4 Collier on Bankruptcy, ś 741.04 (15th Ed.1985). "Customers" are also entitled to payment of not more than $500,000 toward the amount by which their "net equity" claims against the estate exceed their ratable share of the customer property fund, and in no event more than $100,000 for that portion of their claims which is for cash. See, 15 U.S.C. §§ 78111(11) and 78fff-3(a). Creditors who do not qualify as "customers" are limited to recovering their share in the pro rata distribution of the general estate of the debtor.
As noted above, "SIPA was not designed to provide full protection to all victims of a brokerage collapse." SEC v. Packer, Wilbur & Co., 498 F.2d 978, 983 (2d Cir.1974). Rather, its purpose was to extend a measure of special protection for the investments of those parties who fall within the statutory definition of "customer." Section 16 of SIPA contains the definition of "customer" and provides, in relevant part:
The term "customer" . . . means any person (including any person with whom the debtor deals as principal or agent) who has a claim on account of securities received, acquired, or held by the debtor in the ordinary course of its business as a broker or dealer from or for the securities accounts of such person for safekeeping, with a view to sale, to cover consummated sales, pursuant to purchases, as collateral security, or for purposes of effecting transfers.
15 U.S.C. § 78111(2). The definition of customer consists of three basic elements:
(1) the claimant must have a claim for securities or cash "received, acquired, or held" by the broker-dealer in the ordinary course of its business;
(2) the securities or cash must have been received, acquired, or held "from or for the securities account" of the claimant; and
(3) the securities or cash must have been received, acquired, or held by the broker-dealer either (i) for safekeeping, (i) with a view to sale, (iii) to cover consummated sales, (iv) pursuant to purchases, (v) as collateral, or (vi) for effecting transfer;
Repo and reverse repo participants qualify as "customers" of BBS, Inc. under a literal reading of the "customer" definition. First, there is no dispute that repo and reverse repo transactions were an integral part of BBS, Inc.'s ordinary course of business. Nor could there be any such dispute. As reflected in a preliminary schedule of BBS, Inc. assets and liabilities prepared for the Trustee by his accountants and dated November 29, 1985, over $50 million in repo transactions alone were outstanding on the filing date of the BBS, Inc. liquidation proceeding. Second, BBS, Inc. maintained computerized accounts for each repo and *600 reverse repo customer in which purchases and sales pursuant to repo and reverse repo transactions were duly recorded in the same manner as outright purchases and sales. See, e.g., Boitz Dep. at pp. 28-31. Lastly, the securities underlying the repo transactions were held by BBS, Inc. pursuant to the purchase of the securities by the repo participants. Furthermore, in three of the four BBS, Inc. test cases, the securities were placed in safekeeping where they remained on the filing date. In the fourth test case, the securities were to have been placed in safekeeping, but for reasons not in the record the securities were never transferred out of the BBS, Inc. clearing account. Correspondingly, the securities underlying the reverse repo transactions were received and/or acquired by BBS, Inc. with a view to their resale back to the reverse repo participants on a predetermined future date. In each instance, BBS, Inc. received, acquired or held securities in connection with completed or contemplated purchase and sale transactions which were conducted through trading accounts maintained by BBS, Inc. for repo and reverse repo participants.
It may not be enough, however, merely to satisfy the literal requirements of the SIPA "customer" definition. Courts have generally taken a restrictive view of Congress' intended scope of "customer" protection. See, e.g., SEC v. F.O. Baroff Company, Inc., 497 F.2d 280 (2d Cir.1974) (court declined to extend SIPA protection to a claimant that fell within the literal definition of customer). The BBS, Inc. Trustee and SIPC argue that repo and reverse repo participants do not fall within the class of creditors which Congress intended to protect. Implicit in their arguments is the assumption that only unsophisticated individual investors who have engaged in straight purchase and sale transactions in the retail securities market through the bankrupt dealer are protected under SIPA. Such a narrow reading of the statute and its legislative history is unsupportable.
Drawing on the legislative history of SIPA and its predecessor, Section 60 (e) of the Bankruptcy Act, 11 U.S.C. § 96(e) (1938), courts have consistently emphasized two factors which govern the customer status of particular claimants: (1) the transactions in which they were engaged and which form the basis of their claim of customer status must have been related to investment, trading or participation in the securities market, see, Baroff, 497 F.2d at 284; and (2) the transactions must have arisen out of the type of fiduciary relationship which generally characterizes the relationship between a broker-dealer and its customers. See, In re Stalvey & Associates, Inc., 750 F.2d 464 (5th Cir.1985). These two factors were clearly present in the repo and reverse repo transactions which are the subject of the BBS, Inc. test cases.
The repurchase market in government and agency securities is widely regarded as one of the largest and most economically important securities markets in the United States. As noted in the factual background portion of this opinion, the repurchase market plays a critically important role in United States Treasury efforts to finance the burgeoning national debt and in the execution of national monetary policy by the Federal Reserve. In his expert report to the Repo Committee, Clifford Goldman notes that the repurchase market is "considered as important as any of the more well known investment markets in the United States." Goldman Rep., p. 5. Marcia Stigum, the industry expert retained by the BBS, Inc. Trustee, also refers to the repurchase market as the "single most important short-term credit (debt) market in the U.S." Stigum Rep. at 2 & 3.
Repo and reverse repo transactions are an integral part of the trading in the government securities market and constitute a market in themselves. The aggregate value of securities traded daily in the repurchase market is estimated to be several hundred billion dollars. Goldman Rep., p. 7. In contrast, the average daily value of shares traded on the New York Stock Exchange and American Stock Exchange combined is approximately 12 billion dollars. *601 Id. Daily quotations are published and generally made available to the public in publications such as the Wall Street Journal or the Dow Jones News Service. Id. at p. 5-6; Goldman Dep. at 95-96. The SEC has referred to "repurchase agreements" as "trading vehicles" in government securities. SEC Release No. 34-21959. Repo and reverse repo transactions are instrumental in making and maintaining the broadest possible primary and secondary markets for government and agency securities. Indeed, such securities would undoubtedly lose much of their attractiveness as investment securities without the liquidity provided by the repurchase market.
Secondary dealers such as BBS, Inc. function as a vital link in this market. Such dealers routinely engage in matching repo transactions with the securities they acquire in reverse repo transactions. See, e.g., Drysdale, 785 F.2d at 42; Pugh Aff. śś 4-5. In doing so, they effectively match parties holding government securities and seeking short-term cash (reverse repo sellers) with parties holding excess idle cash and seeking short-term investment (repo buyers). In this manner, as in any other conventional securities market, dealers act as intermediaries who stand ready to "make the market." See Goldman Rep., p. 5. Repo and reverse participants are generally viewed by dealers as customers engaged in investment and trading in government securities. Indeed, in his affidavit submitted on behalf of the BBS, Inc. Trustee, Roger Landon acknowledged that repo and reverse repo trades were part of the "various investment services offered to customers" of BBS, Inc. Landon Aff., ś 3 at p. 2.
The Trustee and SIPC contend that claimants must have been trading through rather than with the bankrupt dealer in order to qualify as SIPA "customers." They argue that repo and reverse repo participants were dealing strictly with BBS, Inc., and that the ultimate success of their transactions was dependant upon the continued financial well being of BBS, Inc. rather than the strength of the underlying investment. Thus, they argue that repo and reverse repo participants are no different than ordinary creditors of a dealer who rely on the creditworthiness of the dealer rather than the "vicissitudes of the particular market." See, In re Co Petro, 680 F.2d 566, 571-72 (9th Cir.1982).
This argument, however, is a gross oversimplification which ignores the nature and mechanics of the repurchase market, and must fail for two reasons. First, under the plain language of the statute, the term "customer" includes "any person with whom the debtor deals as principal" for its own account. 15 U.S.C. § 78lll (2). Second, as in any securities transaction, the success of an investment in the repurchase market is directly related to market fluctuations in the underlying security. Reverse repo participants surrender securities for a fixed term during which the market value of the securities is subject to substantial fluctuation. If the market value decreases over the term of the reverse repo agreement, the reverse repo participant will have lost an important opportunity to sell the securities outright. If, on the other hand, the market value increases, he will not only have had the use of a large portion of the cash value of the securities, but will also be repurchasing a more valuable security at a price fixed at the outset of the transaction. Precisely the opposite risks and opportunities for reward attend to every repo transaction. Repo participants also have the opportunity to trade the securities during the term of the repo agreement, trades which no doubt carry their own risks and potential rewards. The risks and potential rewards associated with repo and reverse repo transactions are unquestionably market-related risks and rewards which are entirely distinct from and additional to any credit risk associated with the solvency of the broker as a financial intermediary.
The status of repo and reverse repo participants is thus markedly different than that of the stock lenders who were denied customer status in Baroff and SIPC v. Executive Securities Corp., 423 F.Supp. 94 (S.D.N.Y.1976), aff'd, 556 F.2d 98 (2d Cir. *602 1977). Unlike the stock lender in Baroff, the repo and reverse repo participants in the BBS, Inc. test cases were not contributing "to the capital of the broker-dealer," and did not become creditors of BBS, Inc. for reasons independent of investment and trading in an established securities market. 497 F.2d at 283-84. Nor is there any meaningful resemblance between the repo and reverse repo participants and a "commercial bank, trade creditor, landlord, equipment lessor, or any other party who relies on the ability of a business enterprise to repay a business loan." Id. at 284. Unlike the stock lenders in Executive Securities, the repo and reverse repo participants were investing and trading in securities through customer accounts maintained for them by BBS, Inc. 556 F.2d at 99.
SIPA was intended to protect investors who entered an established securities market by means of the services provided by a broker-dealer and who subsequently incurred losses as a result of the broker-dealer's failure. H.R.Rep. No. 91-1613, 91st Cong., 2d Sess. (1970), reprinted in, 3 U.S.Code Cong. & Ad.News, 5255 (1970). This was precisely the situation in the test case repo and reverse repo transactions. I conclude that the repo and reverse repo participants in the BBS, Inc. test cases are "customers" within the meaning of 15 U.S.C. § 78lll (2). Any other conclusion would require turning a blind eye to the realities of the repurchase market. Furthermore, extending customer status to participants in the repurchase market is entirely consistent with the congressional purpose underlying the enactment of SIPA; that is, to protect individual investors from financial hardship, insulate the economy from the disruption which can follow the failure of major financial institutions, and to maintain public confidence in the capital markets. S.Rep. No. 91-1218, 91st Cong., 2d Sess. 2-4 (1970). Given the size and economic importance of the repurchase market, providing investors in this market with the protections afforded "customers" under SIPA will significantly advance these purposes.
Under this holding, the state law claims of repo participants of entitlement to the securities underlying their repo transactions with BBS, Inc. (or the proceeds of the sale thereof) must necessarily fail. See, Matter of Bevill, Bresler & Schulman, Inc., 59 B.R. 353, 378 (D.N.J.1986). As customers under SIPA, their claims are subject to the SIPA distribution scheme. Absent a showing that the securities underlying the repo transactions are "customer name securities" within the meaning of 15 U.S.C. § 78lll (3) (an unlikely eventuality given the facts in this case), the securities which are the subject of the BBS, Inc. test cases became part of the fund of customer property. To the extent that any of these securities were liquidated pursuant to 11 U.S.C. § 559 by other repo customers of BBS, Inc., any excess proceeds from these sales remitted to the Trustee under this section also become part of the customer property fund. Correspondingly, repo and reverse repo customers of BBS, Inc. are entitled to share in the pro rata distribution of this fund in accordance with 15 U.S.C. § 78fff-2(c)(1)(B) and enjoy any of the other rights and benefits extended to "customers" under SIPA.
C. Treatment of AMC Reverse Repo Agreements
As concluded above, the repo and reverse repo transactions which are the subject of the AMC test cases are purchases and sales of the underlying securities. From the perspective of a reverse repo participant, the transaction involves an outright sale of a security and a contemporaneous agreement to acquire the same security at a future date. The agreement to acquire the security is an executory contract, subject to assumption or rejection by a Chapter 11 Trustee pursuant to 11 U.S.C. § 365(a). This statute provides that, with certain exceptions not relevant here, a trustee, subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor.
Although not defined in the Bankruptcy Code, an executory contract is generally *603 understood to include any contract on which performance remains due to some extent on both sides. N.L.R.B. v. Bildisco, 465 U.S. 513, 522, n. 6, 104 S.Ct. 1188, 1194, n. 6, 79 L.Ed.2d 482 (1984); H.R.Rep. No. 95-595, 95th Cong., 1st Sess. 347 (1977); S.Rep. No. 95-989, 95th Cong., 2d Sess. 58 (1978), U.S.Code Cong. & Admin.News 1978, p. 5787. The reverse repo agreements here at issue clearly meet this definition since substantial performance remained due on both sides as of the commencement of the AMC Chapter 11 reorganization proceeding. AMC was required to convey the securities covered by the reverse repos and the reverse repo customers were required to tender the payment called for under the agreements.
In determining whether to permit a trustee to reject an executory contract courts have traditionally applied the so-called "business judgment standard." Bildisco, 465 U.S. at 523, 104 S.Ct. at 1195; Group of Institutional Investors v. Chicago, Milwaukee, St. Paul and Pacific R. Co., 318 U.S. 523, 550, 63 S.Ct. 727, 742, 87 L.Ed. 959 (1943); 2 Collier on Bankruptcy, para. 365.03 (15th ed.). This standard permits rejection upon a showing that rejection will benefit the estate. See, e.g., Matter of Minges, 602 F.2d 38, 43 (2d Cir.1979).
The AMC Trustee has made a prima facie showing that the estate would benefit from permitting rejection of the reverse repo agreements. The Trustee's sale of the securities acquired by AMC pursuant to the reverse repo transactions yielded proceeds far in excess of the prices the Trustee would obtain by assuming the reverse repo agreements. Trustee's Brief, Appendix A. The Reverse Repo Committee contends that the Trustee has not established a sufficient factual basis to support a finding that rejection of the reverse repo agreements will benefit the estate. Aff. of H. Peter Haveles, Jr. Pursuant to Rule 56(f), 4/14/86, ś 6.
I find that Reverse Repo Agreements in the AMC test cases are executory contracts. However, I will not authorize the Trustee to reject these contracts at this time in order to afford reverse repo participants an opportunity to pursue limited discovery on the issue of whether the estate would benefit by rejection of the Reverse Repo Agreements. Following such limited discovery, the Trustee may separately apply for an order authorizing rejection of the Agreements.
D. Delivery/Transfer of Securities to AMC Repo Participants
The AMC Trustee moves for summary judgment declaring, inter alia, that the repo participants involved in the test cases are general creditors of the estate with no ownership or other legal interest in or to the test case securities or their proceeds. Conversely, the Repo Committee cross-moves for summary judgment declaring that repo participants acquired ownership of the test case securities.
Under Article 8 of the New Jersey version of the U.C.C., the transfer of ownership of securities to a purchaser is governed by the concept of "delivery." See, N.J.U.C.C. § 8-301(1). The 1977 amendments to Article 8 of the U.C.C. adopted by New York substitute the term "transfer" for "delivery." See, N.Y.U.C.C. § 8-301(1). The provisions governing delivery or transfer in both the New Jersey and New York versions of the U.C.C. are specifically set forth in § 8-313(1). Similarly, § 8-302 of both versions of the U.C.C. confers the preferred status of bona fide purchaser upon any purchaser for value who in good faith and without notice of any adverse claim "takes delivery" or receives transfer of a security under relevant provisions of § 8-313(1). Thus, repo participants in the AMC test cases acquired no rights in the underlying securities unless the securities were delivered or transferred to them by one or more of the alternative methods set forth in § 8-313(1).[3].
*604 The Repo Committee contends that the securities underlying the AMC test case repo transactions were transferred or delivered to the repo participants under various of the subsections of § 8-313(1) of the New York or New Jersey versions of the U.C.C. Each of these subsections will be examined in turn.
1. Section 8-313(1)(a) of the N.Y.U.C.C. and N.J.U.C.C.
Section 8-313(1)(a) provides that delivery/transfer to a purchaser occurs when the purchaser or a person designated by him or her acquires possession of a security. For delivery/transfer to take place under this section, the purchaser or his or her designee must obtain actual physical possession of the security. Matter of Paragon Securities Co., 599 F.2d 551, 555 (3d Cir.1979). The only party to have had actual physical possession of the securities in the AMC test cases was SPCSC, and at no time was it acting as the designee of any of the repo participants.
2. N.J.U.C.C. § 8-313(1)(e) and N.Y.U.C.C. § 8-313(1)(g)
These analogous subsections of § 8-313(1) provide that delivery/transfer of a security to a purchaser occurs when appropriate entries on the books of a clearing corporation are made under § 8-320, which, in turn, requires that the clearing corporation reduce the account of the transferor and increase the account of the transferee by the amount of the obligation or the number of shares or rights transferred. Section 8-102(3) of both versions of the U.C.C. defines "clearing corporation." AMC is not a "clearing corporation" because it is not owned by an entity that satisfies the criteria of § 102(3). There is nothing in the record to establish that SPCSC is or is not a "clearing corporation." However, even if SPCSC is a "clearing corporation," it did not maintain separate accounts or sub-accounts for repo participants in which it credited purchases of securities made in connection with repo transactions with AMC.
Even assuming that the AMC safekeeping account exclusively held securities which were acquired and paid for by repo participants and other purchaser customers of AMC, it does not follow that the safekeeping account can be construed to be "the account of the transferee" in a repo transaction for purposes of applying § 8-320. Therefore, contrary to the argument advanced by the Repo Committee, delivery/transfer of a security to a repo participant under N.J.U.C.C. § 8-313(1)(e) and N.Y.U.C.C. § 8-313(1)(g) could not be affected merely by decreasing the AMC clearing account and increasing the AMC safekeeping account by the amount of the security involved in the repo transaction.
3. N.J.U.C.C. § 8-313(1)(d)
Under this section of the N.J.U.C.C., delivery to a purchaser occurs "with respect to an identified security to be delivered while still in the possession of a third person when that person acknowledges that he holds for the purchaser." The Repo Committee argues that the notation of the name of a repo purchaser on the Seg Move Tickets generated by SPCSC is sufficient acknowledgement of the interest of the repo participant in the underlying security to constitute delivery under § 8-313(1)(d).
Although no judicial guidance exists as to how a third person "acknowledges" that it holds securities for a purchaser under § 8-313(1)(d), New Jersey Study Comment 2 to § 8-313 states that delivery under subsection (1)(d) is accomplished by means of an "attornment." Black's Law Dictionary 119 (5th ed. 1970) defines attornment as "[t]he agreement of a person to recognize a third party as a permissible successor party to a contract." Furthermore, an attornment "requires an overt act." Hemminger v. Klaprath, 15 N.J. Misc. 163, 189 A. 363 (Ct. Common Pleas 1937).
*605 The factual record in the AMC test cases supports a conclusion that SPCSC never overtly acknowledged custodial obligations to the customers of AMC. SPCSC acted solely on instructions from, and on behalf of AMC to receive, transfer or deliver securities and cash. It did not accept instructions from and had no relationship with AMC's customers. SPCSC did not maintain subaccounts in the AMC safekeeping account for AMC's customers, and it confirmed safekeeping account positions only to AMC. It noted the name of AMC's customer on Seg Move Tickets only if this information was supplied by AMC in its DEX instructions to SPCSC, and then only to assist AMC in its own record-keeping. SPCSC did not use this information for any purpose related to the custody or safe-keeping of the underlying security. Given these facts, it cannot be said that SPCSC affirmatively acknowledged that it was holding securities in safekeeping for the benefit of particular repo participants, or that it overtly recognized repo participants as the successors to the contractual services SPCSC performed for AMC.
4. N.J.U.C.C. § 8-313(1)(c) and N.Y.U.C.C. § 8-313(1)(d)
Section 8-313(1)(c) provides that delivery to a purchaser occurs when:
(c) his broker sends him confirmation of the purchase and also by book entry or otherwise identifies a specific security in the broker's possession as belonging to the purchaser.
"Broker" is defined in Section 8-303:
"Broker" means a person engaged for all or part of his time in the business of buying and selling securities, who in the transaction concerned acts for, buys a security from, or sells a security to, a customer.
The 1977 amendments to the U.C.C. adopted by New York in 1982 split New York's now replaced § 8-313(1)(c) into three subsections, only two of which are relevant to the present motions and cross-motions. Section 8-313(1)(d) of the N.Y.U.C.C. provides, in relevant part, that transfer of a security to a purchaser occurs:
(d) at the time a financial intermediary, not a clearing corporation, sends him confirmation of the purchase and also by book entry or otherwise identifies as belonging to the purchaser
(i) a specific certificated security in the financial intermediaries possession; [or]
- - -
(iii) a quantity of securities that constitute or are part of a fungible bulk of securities shown on the account of the financial intermediary on the books of another financial intermediary.
Section 8-313(4) defines a "financial intermediary" as "a bank, broker, clearing corporation or other person (or the nominee of any of them) which in the ordinary course of its business maintains security accounts for its customers and is acting in that capacity." The definition of "broker" in § 8-303 of the N.Y.U.C.C. is identical to that found in the same section of the N.J.U.C.C.
As an initial matter, the AMC Trustee and the Reverse Repo Committee contend that an entity which acts as principal for its own account, as was AMC in the test case transactions, does not fit the statutory definitions of broker/financial intermediary. This argument is sustainable only if the plain language of the relevant statutes is ignored. The definition of broker in § 8-303 includes an entity which "in the transaction concerned . . . buys a security from or sells a security to a customer." This is precisely what occurred in the AMC repo transactions. This definition is intended to be applied on a "functional" basis. See, New Jersey Study Comment, ś 1. Similarly, one of the entities included in the definition of "financial intermediary" is a "broker" who "maintains security accounts for its customers and is acting in that capacity." In keeping with this definition, AMC maintained computerized customer accounts for each of its repo customers and recorded repo purchases on these accounts in the same manner as it would outright *606 purchases and sales. The Reverse Repo Committee relies on a statement of the drafters of the amended version of the U.C.C. to the effect that an entity "is not a financial intermediary with respect to securities it holds . . . for its own account. A.L.I., Uniform Commercial Code â 1978 Official Text, at 832 (9th ed.). The transaction documents do not reflect the securities underlying the test case repo transactions as having been held by AMC for its own account. Rather, the confirmations sent by AMC to its repo customers reflect AMC's agreement to hold the securities in its safekeeping account, which, under its agreement with SPCSC, was a "denominated account for fully paid securities." I conclude that AMC was a "broker"/"financial intermediary" for purposes of applying N.J.U.C.C. § 8-313(1)(c) and N.Y.U.C.C. § 8-313(1)(d) to the repo transactions at issue in the AMC test cases.
Aside from the substitution of the terms "transfer" for "delivery" and "financial intermediary" for "broker" and use of the term "certificated security," N.Y.U.C.C. § 8-313(1)(d)(i) is substantively identical to N.J.U.C.C. § 8-313(1)(c). In order for delivery/transfer to occur under these two analogous subsections, three requirements must be satisfied: (1) the broker/financial intermediary must send confirmation of the purchase; (2) the broker/financial intermediary by book entry or otherwise must identify a specific security as belonging to the purchaser; and (3) the security must be in the broker/financial intermediary's possession. See, Paragon, 599 F.2d at 555.
As to the first requirement, there is no dispute that AMC issued confirmations of repo purchases to the repo participants. Nor, with regard to the second criteria noted above, do any of the parties to the present motions and cross-motions dispute that AMC identified on its books and records the securities underlying the test case repo transactions as belonging to the repo participants. Rather, relying heavily on the decisions in Matthysse v. Securities Processing Services, Inc., 444 F.Supp. 1009 (S.D.N.Y.1977) and Paragon, supra, the AMC Trustee and the Reverse Repo Committee contend that the requisite acts of identification must be performed by the party having actual possession of the securities. Since SPCSC had actual possession of the securities which are the subject of the AMC test cases, they conclude that SPCSC, and not AMC, must have affirmatively identified the securities as belonging to the repo participants for delivery to have been accomplished under either N.J.U.C.C. § 8-313(1)(c) or N.Y.U.C.C. § 8-313(1)(d)(i). However, the Matthysse and Paragon decisions neither expressly nor implicitly require such a result.
The facts set forth in Matthysse reveal only that the broker sent confirmations to a purchaser of municipal bonds and further transmitted copies of the confirmations together with delivery instructions to its clearing agent. There is no evidence that the broker undertook to identify the specific bonds on its own books and records as belonging to the purchaser. The clearing agent, on the other hand, physically allocated specific certificates corresponding to the instructions it received from the broker, and "recorded explicitly identifying information on the delivery forms, including the certificate numbers and [the purchaser's] name." 444 F.Supp. at 1018. The court found that these activities constituted sufficient identification "by book entry or otherwise." Id. The opinion is silent as to whether delivery would have been affected had the broker recorded the same identifying information on its own books. Nevertheless, the court concluded:
[W]hen a broker executes a purchase . . ., identifies the securities, and sends confirmation to the purchaser, delivery to that purchaser is complete under § 8-313(1)(c), even if the broker himself has not maintained actual physical possession of the certificates.
Id. at 1020 (citations omitted). The clear implication of this language is that the broker can perform the required identifying acts notwithstanding actual possession of the securities in the hands of a clearing agent.
*607 The Third Circuit in Paragon was more explicit in this regard. Paragon involved reclamation rights claimed under § 60(e) of the former Bankruptcy Act, which provided for reclamation of "specifically identifiable securities" by a customer of an insolvent broker. The court construed the identification requirement under N.J.U.C.C. § 8-313(1)(c) and § 60(e) to be "substantially the same." 599 F.2d at 555.
The broker in Paragon maintained three separate accounts with its clearing agent; two general inventory accounts and a third account for customer safekeeping. The broker made a bulk acquisition of $150,000 of bonds of the same description and placed them in one of its general inventory accounts with the clearing agent where the bonds remained until the date of bankruptcy. Id. at 556. Following this bulk acquisition, the broker sold $30,000 of the bonds to the claimant. The broker listed on its computer printouts $30,000 of the bonds as assigned to the claimant. However, the court noted that these records did not reflect any certificate numbers. Id. at 557. Having reviewed the scant evidence of identification by the broker, the court went on to find that, "[i]n addition, at no time prior to bankruptcy did [the clearing agent] specifically allocate or otherwise earmark certain bonds for [the claimant]." Id. The court concluded that "[the claimant] has failed to prove that [the broker] or [the clearing agent] ever allocated or physically set aside the bonds for her prior to bankruptcy." Id. (emphasis added). Although not explicitly stated by the court, an obvious corollary of this finding is the conclusion that either the broker or the clearing agent could have satisfied the identification requirement. See also Louisiana State School Lunch Employees Retirement System v. Legel, Braswell Government Securities Corporation, 699 F.2d 512, 514 (11th Cir.1983) (court noted that broker may have satisfied § 8-313(1)(c) identification requirement, but concluded that broker's clearing agent definitely had).
Permitting the broker to perform the identifying acts required to affect delivery/transfer of a security to a purchaser under N.J.U.C.C. § 8-313(1)(c) and N.Y.U.C.C. § 8-313(1)(d) is entirely consistent with the purpose of Article 8 of the U.C.C. The Official Comment to § 8-313 of the N.J.U.C.C. states that the delivery provisions of that section are intended "to conform to modern conditions under which the bulk of securities transactions are handled by brokers and on organized markets." The Official Comment to § 8-313 of the N.Y.U.C.C. similarly states that "[t]his section is intended to bring the law of securities transfers into line with modern security trading practices and allow for future development of those practices." The New York Annotations to § 8-313 provide that the sections of Article 8 are designed to promote "the ready and easy transfer of securities without excessive investigation of title questions." If this goal is to be met, a prospective purchaser of securities should have to look no further than the books and records of a broker to determine whether particular securities have been identified as belonging to other of the broker's customers. This is particularly true if, as in this case, the books and records of the broker's clearing agent are not accessible to the broker's current or prospective customers. See, Viviano Statement at p. 2, 7-8 (SPCSC did not accept instructions from and had no knowledge of or relationship with the customers of its dealer customers. Any inquiries from third parties were referred to its dealer customers).
"Ready and easy transfer" or delivery of securities is particularly important in the repurchase market for government and agency securities. Repo and reverse repo transactions are frequently of short duration, often overnight. Such transactions are attractive investment vehicles largely because of the flexibility and liquidity they afford market participants. For these reasons, the ability to transfer the underlying securities quickly and inexpensively is critical to the continued efficient functioning of this market.
A delivery/transfer rule which required the party with actual possession of securities to perform the necessary acts of identification *608 would impede the free flow of securities in the securities markets generally and the repurchase market in particular and thereby frustrate the purpose of Article 8. As a matter of economy and practicality, purchasers of securities frequently do not take possession of the underlying securities. The transaction costs of a delivery (possessory) repo are generally much greater than those of a custody (non-possessory) repo. See, Goldman Rep., Exh. C, pp. 9-12. In addition, actual delivery of securities may not be feasible in repo transactions of short duration. Consequently, repo participants typically leave the securities in the possession of the seller brokers who, in turn, customarily hold the securities in accounts maintained for them by clearing agents.
If the identification provisions of § 8-313(1) could be satisfied only by the clearing agents in such custody repo arrangements, then repo purchasers would not take delivery or receive a transfer of the securities unless they (1) took steps to assure that their interest in the securities was properly recorded by the clearing agent through some manner of subaccounting within the broker's accounts, or (2) opened a separate account with the broker's clearing agent in which the securities would be held during the term of the repo transaction pursuant to a tripartite repo agreement. The first method of securities delivery/transfer may not be available as an option. Certain clearing agents simply do not provide subaccounting services as part of their omnibus clearing operation. SPCSC, for example, "does not provide retail account subaccounting." Viviano Statement, p. 2. Its services "are provided only on an omnibus basis and do not reflect the positions of [its] dealer customers' customers." Id. at p. 4. "[T]he dealer manages and controls its relationship with its own customers." Id. at p. 2. Correspondingly, certain clearing firms are unwilling to enter tripartite arrangements and otherwise refuse to maintain accounts for the safekeeping of securities for the customers of its dealer customers. See, id. at p. 11 ("omnibus clearing firms do not presently provide any type of safekeeping service to customers of dealer customers") (original emphasis). Furthermore, investors who customarily deal with more than one broker would have to open separate accounts with the clearing agents of each of the brokers with whom they transact business, or be forced to rely on the services and rates offered by only one broker. The cost of maintaining a separate custodial account is estimated to be approximately $300 a month. See, Goldman Rep., Exh. D. p. 37, n. 49. Such additional costs could effectively deter small thrift institutions and municipalities who engage in relatively small transactions on an irregular basis from participating in the market.
Delivery/transfer would be particularly problematic in transactions involving book-entry securities. Under applicable federal book-entry regulations, the depository institution whose interest in a given security is recorded on the books of a Federal Reserve Bank is deemed to have possession of the security as if it were being held in certificated (bearer-definitive) form. See, e.g., 31 C.F.R. 306.118(a). However, given the multi-tiered custodial system for book-entry securities, a purchaser of the security in the repurchase market is likely to be several levels removed from the depository institution. To require the depository institution and every intermediate party to maintain subaccounts for every purchaser of the security (who does not request the wire transfer of the security to an account at another depository institution) and duly identify the interest of each such purchaser on their books would be extraordinarily burdensome. See, Goldman Rep. at pp. 23-25.
In short, rather than conforming the provisions of Article 8 to existing securities trading practices and allowing "for the future development of these practices," the identification requirement urged by the AMC Trustee and the Reverse Repo Committee would impede trading activity in the repurchase market and restrict access to and discourage participation in this market. I conclude that the identification requirement *609 of N.J.U.C.C. § 8-313(1)(c) and N.Y.U.C.C. § 8-313(1)(d)(i) can be satisfied by either the broker or the broker's clearing agent (provided such clearing agent is not a "clearing corporation").
In distinct contrast to the broker in Paragon, AMC in the present test cases recorded the ownership interest of repo participants in the underlying securities in various documents and bookkeeping entries. Physical securities (such as the test case GNMAs) were identified in the customer confirmations issued by AMC and in other records of AMC by cusip number, pool number, interest rate, maturity date and face amount. AMC similarly identified book-entry securities by the issuer, title of the issue, cusip number, coupon rate, maturity date and face amount. The repo securities, so identified, were carried on the books and records of AMC as having been purchased by and belonging to the repo participants. Thus, in addition to the various transaction documents themselves (i.e., confirmation slips and the repo agreements) which were part of AMC's records, there were other records and entries (e.g., trade tickets, computerized customer accounts for each repo customer listing the securities acquired in repo transactions as having been "bought," stock record position lists showing particular securities as held "long" by the repo participants, delivery instructions to BTC or SPCSC identifying particular securities as having been sold to repo participants, and copies of "in seg" tickets received from the clearing entities advising AMC that particular securities had been placed in safekeeping).
The quantum and substance of the records maintained by AMC supports the undisputed conclusion that AMC sufficiently identified the securities underlying the test case repo transactions as belonging to the repo participants.
Under the third criterion for affecting delivery/transfer of a security under N.J.U.C.C. § 8-313(1)(c) and N.Y.U.C.C. § 8-313(1)(d)(i), even if a broker satisfactorily identifies "by book-entry or otherwise" the ownership interest of a purchaser, delivery/transfer of a security is not complete unless and until the broker is in possession of the security. There is no dispute that AMC did not have actual possession of any of the securities at issue in the present test cases. All of the certificated securities were physically in the possession of SPCSC. To the extent the concept of physical possession has meaning with respect to book entry securities, the Treasury Notes here at issue are deemed to have been in the possession of SPNT Co. under applicable federal book-entry regulations.
Actual physical possession by the broker, however, is not a prerequisite to completing delivery/transfer of securities to a purchaser. A number of courts have considered the issue of whether the possession requirement is satisfied when securities sold by a broker are held in custodial accounts maintained for the broker by a clearing firm. These courts have uniformly held that subsection 8-313(1)(c) of the pre-1977 version of the U.C.C. requires only that a broker have effective or constructive possession of the securities. In Legel, Braswell, supra, the Eleventh Circuit concluded:
just as it is unnecessary for the purchaser to acquire physical possession of a security to obtain delivery, it is unnecessary for the broker to have physical possession to make delivery. At the time the bonds were identified as belonging to [the purchaser], they were in the possession of [the broker's clearing agent]. Possession by a clearing agent for the broker's account is sufficient under § 8-313(1)(c) . . .
699 F.2d at 515. See also, Matthysse, 444 F.Supp. at 1018.
Given the identity of language in the pre-1977 version of § 8-313(1)(c) and its analogue in the post-1977 version of the U.C.C., the same conclusion necessarily applies to N.Y.U.C.C. § 8-313(1)(d)(i). As stated in the Official Comment to § 8-313 of the 1977 Official Text:
It is recognized that most transfers are not effected through physical delivery of a certificate from seller to buyer, *610 but rather through adjustments in balances of the parties' accounts with various intermediaries. Whether each intermediary has physical possession of a certificate to match every security it "holds" in its customer accounts is of no importance. So long as the intermediary exercised ultimate control, the securities may equally well take the form of an account with a securities depository, with another intermediary or with a transfer agent.
Thus a "financial intermediary" . . . must control the disposition of securities pursuant to its customers' orders but may exercise its control in any of a number of forms â e.g., maintaining possession of certificated securities, being registered owner or registered pledgee of uncertificated securities, or having its own account with another financial intermediary. The important factor is that the intermediary must "hold" securities in an account for the customer.
As the preceding passage demonstrates, "control" is the critical element in determining whether a broker/financial intermediary had constructive possession of securities for purposes of effecting their delivery/transfer to a purchaser. As a general rule, in order to be in constructive possession, a party must intend and have the capability to exercise control and dominion over the property in question. Rodella v. United States, 286 F.2d 306, 311 (9th Cir. 1960), cert. denied, 365 U.S. 889, 81 S.Ct. 1042, 6 L.Ed.2d 199 (1961); United States v. Holland, 445 F.2d 701, 703 (D.C.Cir. 1971).
SPCSC maintained two accounts for AMC: a clearing account and a safekeeping account. On the filing date of the AMC reorganization proceeding, the securities underlying the test case repo transactions were located in one or the other of these two accounts. Thus, the extent to which AMC exercised control and dominion over securities held in each account must be separately examined before a final determination can be made as to whether particular securities were delivered or transferred to repo participants.
The Clearing Agreement between SPCSC and AMC defined their respective rights and obligations with regard to the securities held in the two separate accounts. Consistent with the services which clearing firms customarily offer their dealer customers, SPCSC provided financing to AMC by making payment for delivered securities when AMC did not have sufficient funds on deposit with SPCSC to complete the transactions. As security for such clearing loans to AMC, the Clearing Agreement granted SPCSC a lien upon the securities in the AMC clearing account. Furthermore, in order to afford SPCSC some measure of control over the collateral which secured its loans to AMC, paragraph 4(c) granted SPCSC the unilateral right to disregard AMC's instructions regarding the movement of securities out of the clearing account. The exercise of this right was not dependent upon a prior judicial determination that SPCSC's lien on the clearing account securities was valid or that SPCSC's compliance with AMC's instructions would in fact render SPCSC less than adequately secured. Rather, SPCSC had total discretion to refuse to deliver securities or transfer them to safekeeping in accordance with AMC's instructions if SPCSC deemed itself to be less than adequately secured, and it could do so without notice to AMC. SPCSC also had the right to utilize the securities subject to its lien for its own purposes without notice to AMC. Paragraph 6 of the Clearing Agreement authorized SPCSC to:
deposit the Collateral with agents, correspondents and clearing agents and may pledge, grant a security interest in, hypothecate, re-hypothecate, enter into and perform repurchase and reverse repurchase agreements and securities loan and securities borrow agreements with the Collateral, separate or together with collateral of other clients, without retaining possession or control of a like amount of Collateral and without notice to [AMC].
*611 SPCSC was further entitled to retain any profits it derived from such use of the collateral.
The Clearing Agreement thus gave SPCSC a measure of control over securities held in the AMC clearing account which is inconsistent with a conclusion that AMC retained constructive possession of them. SPCSC's rights under the Agreement effectively deprived AMC of the degree of control and dominion over the securities required for purposes of effecting delivery/transfer. In particular, SPCSC's unilateral right to declare itself inadequately secured and at its sole discretion to refuse to comply with AMC's instructions divested AMC of constructive possession of clearing account securities.[4]
The Third Circuit's critique in Paragon of the Matthysse decision suggests that it would reach the same conclusion. The Matthysse court had concluded:
[The broker's] effective "possession" of the bonds ordered from it by [the purchaser] is established for purposes of [§ 8-313(1)(c) of the pre-1977 version of the U.C.C.] by virtue of its contractual relationship with [the clearing firm], which held the bonds on behalf of [the broker] as its clearing agent and subject to its directions.
444 F.Supp. at 1018. The Third Circuit in Paragon criticized the failure of the Matthysse court to consider the clearing agent's lien on the bonds as a factor in determining whether the broker had constructive possession for purposes of applying § 8-313(1)(c):
[T]he court in Matthysse appeared to ignore the security interest [the clearing agent] held in the bonds in the general inventory account. This lien severely limited Paragon's ability to control the bonds.
599 F.2d at 557.
There are important public policy considerations which militate against a finding that AMC retained constructive possession of securities held in the clearing account at SPCSC. The financing provided by clearing firms to their broker-dealer customers is an essential element of the government securities market. FRBNY estimates place the credit extended each day in the government securities market by such clearing *612 firms in the tens of billions of dollars. Aff. of Cathy E. Minehan, ś 8 (FRBNY Amicus Brief, Exhibit I to Exhibit B).
There is no question that secondary dealers in the government securities market, such as AMC, could not continue to function in this market without this source of credit.
If broker-dealers are determined to have constructive possession of the securities located in clearing accounts maintained for them by clearing firms, then they could unilaterally complete a legal delivery of these securities to their customers notwithstanding the clearing firms lien on the securities. Without notice to the clearing agent, a broker-dealer could transfer a security held in a clearing account to a subsequent bona fide purchaser who, under § 8-304 of the U.C.C., acquires rights in a security "free of any adverse claim." Thus, the clearing firm could not determine with any degree of certainty whether the broker-dealer had by its own acts cut off the firm's security interest in the collateral. The clearing firm would be effectively deprived of its ability to protect its status as a lien creditor, secured by the broker-dealer's clearing account portfolio, and would be forced to regard the firm's interest in the securities as unsecured. See, e.g., Aff. of Stephen G. Thieke, ś 11 (FRBNY Amicus Brief, Exhibit A to Exhibit C).
It is unlikely that such firms would be willing or permitted by the FRBNY to continue their current large volume clearing operations on an unsecured basis. Id. at ś 12. As a result, they would be required to (1) decrease the level of broker-dealer financing to acceptable unsecured levels; (2) process securities transactions on behalf of their broker-dealer customers only if sufficient funds are available; or (3) require their broker-dealer customers to post nonsecurities collateral. Id.
Any of the above three alternative approaches to clearing operations would have dramatic adverse effects on the government securities market. The level of activity clearing firms would be willing or allowed to sustain on an unsecured basis would be negligible. Id. at ś 13. Because their operations are so highly leveraged, most broker-dealers could not obtain sufficient funds prior to delivery of securities to the clearing firm that would cover the amount owed. Lastly, broker-dealers simply do not have nonsecurities assets sufficient to cover clearing firm financing. Id.
I conclude that AMC did not maintain constructive possession of securities held in its clearing account at SPCSC. Consequently, those securities underlying the AMC test cases which were located in the AMC clearing account on the filing date of the AMC reorganization proceeding were not delivered or transferred to repo participants pursuant to N.J.U.C.C. § 8-313(1)(c) and N.Y.U.C.C. § 8-313(1)(d)(i).
Unlike securities held in its clearing account at SPCSC, under the express terms of the Clearing Agreement AMC unquestionably retained sufficient control and dominion over securities located in its safekeeping account for purposes of effecting delivery/transfer under N.J.U.C.C. § 8-313(1)(c) and N.Y.U.C.C. § 8-313(1)(d)(i). Paragraph 3(h) allows SPCSC to "hold securities which [AMC] identifies in writing to SPCSC as fully paid securities by entering same on its books in a denominated account." Securities in this segregated account were not to be "reclassified or otherwise disposed of [by SPCSC] except upon receipt by SPCSC of [AMC's] written instructions." Paragraph 6 further provided that SPCSC's lien "shall not extend to securities which SPCSC, in accordance with [AMC's] instructions, shall have entered on its books as a denominated account for fully paid securities." SPCSC was given no rights to the securities held in the safekeeping account, and, conversely, there was nothing in the Clearing Agreement which limited or qualified AMC's control or dominion over the securities.
The parties opposing the Repo Committee's cross-motion for summary judgment argue that AMC did not have effective control or dominion over the securities in the safekeeping account. In support of *613 this contention, these parties rely on deposition testimony of Joseph Guardino, an Assistant Vice-President of SPCSC, in which he acknowledged occasions when SPCSC's control department unilaterally, without first consulting AMC, moved securities from AMC's safekeeping account to AMC's clearing account to cover short positions in the clearing account. However, a close reading of the deposition testimony of Mr. Guardino does not support a conclusion that SPCSC was acting on these occasions without instructions from AMC. The following is a brief rendering of relevant portions of this testimony.
On occasion SPCSC would receive instructions from a dealer customer to deliver securities out of its clearing account when there were insufficient securities in the clearing account to meet the delivery. In the ordinary course of business, SPCSC would never complete a delivery if there were insufficient securities in the customer's clearing account. Guardino Dep., pp. 262-63. The SPCSC account manager who received the delivery instruction would advise the customer that SPCSC could not complete the delivery because of the insufficiency. Id. at pp. 264 & 265. The customer might advise the account manager that the securities were located in its safekeeping account and instruct SPCSC to transfer them to its clearing account. Id. at pp. 264 & 269. As a matter of standard operating procedure, SPCSC would not move securities from a segregation account to a clearing account without first receiving instructions to do so from the customer. Id. at pp. 124-25. Upon receiving instructions from the customer to make the transfer from safekeeping to clearing, the account manager would customarily execute an `out seg' ticket to effect the transfer and proceed to complete the delivery originally requested by the customer. Occasionally, the account manager would neglect to make the `seg move' of the securities from safekeeping to clearing. Id. at pp. 130 & 269. As a result, there would be a short position of the securities in the clearing account; that is, there would be a negative balance of that issue of securities in the clearing account. This short position would subsequently be detected by the SPCSC control department which, if it could locate the original delivery instruction from the customer, would correct the imbalance by moving the necessary amount of like securities from safekeeping to clearing. Id. at p. 270. The control department would complete this move without first checking with the account manager or the customer to confirm whether the customer had previously given instructions for the move. Id. at p. 127.
It does not follow from this testimony that SPCSC was necessarily acting without instructions from its dealer customer when its control department moved securities from safekeeping to clearing. Rather, the actions of the control department appear to have been based on the assumption that the account manager had received instructions for the move and had neglected to complete an `out seg' ticket to effect the `seg move.'
The parties opposing the cross-motion of the Repo Committee cite to two specific occasions when, in order to cover short positions in the AMC clearing account, the SPCSC control department moved securities which had been purchased by Champlain in a repo transaction with AMC from AMC's safekeeping to its clearing account. However, even with regard to these specific instances, the record does not reflect whether AMC ever gave instructions to an SPCSC account manager authorizing the moves. Guardino Dep. at p. 130; Green Aff. (Pennbank-AMC-Champlain), ś 21.
However, even assuming for purposes of the Repo Committee's cross-motion that SPCSC did on occasion move securities from safekeeping to clearing without instructions from AMC, this fact would not cause AMC to forfeit control and dominion over the securities held in its safekeeping account. Such actions by SPCSC would appear to be in direct violation of paragraph 3(h) of the Clearing Agreement. Wrongful acts by one party to a contract do not defeat the contractual rights of its counterparty. Thus, AMC's rights under *614 the Clearing Agreement were not defeated by unilateral acts of SPCSC in violation of the Agreement.
In the securities industry safekeeping accounts such as the one maintained by SPCSC for AMC are generally intended to provide broker-dealers with an efficient means of segregating securities which belong to their customers from those which belong to the broker-dealers themselves and are relied on as collateral for clearing loans to the broker-dealers. Landon Dep. at pp. 51-52; Goldman Rep., Exh. D, p. 36. Under SEC Rule 15c3-3, registered broker-dealers are required to "maintain physical possession or control of all fully-paid securities . . . carried by a broker or dealer for the account of customers." 17 C.F.R. 240.15c3-3. The `control' requirement of the Rule may be satisfied by holding the securities in one of several permissible `control locations', including a clearing house. 17 C.F.R. 240.15c3-3(c)(1). Although AMC was not a registered broker-dealer subject to the requirements of Rule 15c3-3, the SEC has noted that "[h]old-in-custody arrangements for government securities [repurchase transactions] are functionally the same as custody arrangements for customer funds and securities under [SEC] Rule 15c3-3." SEC Report, Goldman Rep., Exh. D, p. 36, n. 48. If broker-dealers are found not to retain control and dominion over securities held in safekeeping accounts with clearing firms for purposes of applying Article 8 of the U.C.C., then the integrity of hold-in-custody arrangements throughout the industry would be thrown into question.
If broker-dealers could not effect delivery/transfer to their customers of securities placed in their safekeeping accounts with clearing firms, then delivery/transfer could not occur unless the clearing firms maintain separate accounts or subaccounts for the customers of their broker-dealer customers, or unless customers of broker-dealers take actual physical delivery of certificated securities or receive a wire transfer of book-entry securities to a depository institution where they maintain a separate book-entry account. The public policy reasons for not requiring purchasers to maintain subaccounts or separate accounts for purposes of satisfying U.C.C. identification requirements (discussed infra.) are equally as compelling here. Furthermore, a delivery/transfer rule which required purchasers to take actual delivery of securities could cause severe disruptions of the government securities market.
First, the additional costs associated with the physical delivery or wire transfer of securities could drive a large number of investors out of the government securities market. The SEC has noted that such costs are sufficiently high to render economically unfeasible any short-term repo transaction in book-entry securities for less than a million dollars, and an even greater variety of repurchase transactions involving certificated securities. SEC Report, Goldman Rep., Exh. D, p. 37. The Public Securities Association ("PSA"), a national organization of banks and broker-dealers involved in the government securities market, has also suggested that repo transactions with maturities of less than 30 or 60 days would not be economically feasible if physical delivery or wire transfer of securities were required in order to obtain delivery/transfer of securities under the U.C.C. See, Goldman Rep., Exh. C, p. 14. Investors who typically engage in short-term repo transactions or repo transactions involving relatively small amounts of securities would see the yield on such investments all but consumed by the added delivery costs, and their withdrawal from the secondary market for government securities could undermine the liquidity of securities in this market. See generally, Goldman Rep., pp. 37-39.
Second, such a rule would impose operational burdens on the Federal Reserve book-entry system which could reduce the volume of business which could efficiently be transacted over the fedwire. As explained by the SEC:
In addition to being costly, an across-the-board delivery requirement would impose operational burdens on the industry. *615 With respect to book-entry Treasury and agency securities, there already are significant delays on the [Federal Reserve] wire system, and its use for additional [repo] deliveries could increase delays.
SEC Report, Goldman Rep., Exh. D, p. 38.
For these reasons, among others, both the SEC and the PSA have publicly set forth their opposition to any rules which would require actual delivery of securities in repurchase transactions. See, Goldman Rep., Exh. C, p. 22, and Exh. D, p. 39.
I conclude that AMC retained control and dominion over securities held in its safekeeping account with SPCSC and thereby had constructive possession of these securities for purposes of effecting their delivery/transfer to repo participants under N.J.U.C.C. § 8-313(1)(c) or N.Y.U.C.C. § 8-313(1)(d)(i).
If securities are delivered in accordance with N.J.U.C.C. § 8-313(1)(c) or N.Y.U.C.C. § 8-313(1)(d)(i), the purchaser may acquire his or her rights as a bona fide purchaser, thereby cutting off all prior claims. See, N.J.U.C.C. § 8-313(2) and N.Y.U.C.C. §§ 8-313(2) and 8-302(1)(c). However, if the three requirements for achieving delivery/transfer under these two sections are not satisfied, then a purchaser acquires no interest in the securities. Thus, purchasers receive "all or nothing" under these two sections.
Subsection 8-313(1)(d)(iii) of the N.Y.U.C.C. modifies this result somewhat. A purchaser who receives a transfer of securities under this subsection cannot achieve the status of a bona fide purchaser and therefore does not acquire the securities free of the adverse claims of other parties, if any. Rather, such a purchaser is entitled to receive a proportionate share of the securities along with other parties with legitimate claims to the same securities. N.Y.U.C.C. § 8-313(2).
Subsection 8-313(1)(d)(iii) expressly covers situations such as those arising in the present test cases where securities are held by one financial intermediary in an account with another financial intermediary, such as a clearing firm. As under § 8-313(1)(d)(i), either financial intermediary must identify the securities as belonging to the purchaser. However, there is no requirement that the financial intermediary have possession of the securities. Thus, for purposes of applying § 8-313(1)(d)(iii), it makes no difference whether the securities are held in a clearing or safekeeping account. Instead, the securities must be shown on the account of the financial intermediary to constitute or be part of a fungible bulk of securities. "Fungible" refers to "securities of which any unit is, by nature or usage of trade, the equivalent of any other like unit." N.Y.U.C.C. § 1-201(17).
The Repo Committee contends that the securities underlying the AMC test cases were transferred to repo participants under N.Y.U.C.C. § 8-313(1)(d)(iii). This argument does not hold up with regard to the certificated GNMA securities at issue in the present test cases. Although GNMA securities may be fungible with other securities issued in the same pool, see e.g., Matter of Bevill, Bresler & Schulman, Inc., 59 B.R. at 356, section 8-313(1)(d)(iii) relates to the manner in which the securities are held by the broker for the purchaser. See, N.Y.U.C.C. § 8-313(2). There is no evidence that the GNMA securities underlying the AMC test case repo transactions were held by AMC in its clearing or safekeeping accounts at SPCSC as part of a fungible bulk of securities. Rather, the evidence supports a conclusion that the GNMA securities were held as separate and distinct securities. I accordingly find that N.Y.U.C.C. § 8-313(1)(d)(iii) applies, if at all, only to the book-entry Treasury Notes claimed by Champlain. With regard to these Notes, there is no question that AMC sent confirmation of the purchase and sale to Champlain, identified the quantity of Notes as belonging to Champlain, and held the securities in its clearing and safekeeping accounts as part of a fungible bulk of Notes of the same issue. Green Aff. (Pennbank-AMC-Champlain), Exhibits I-1, P, W, and X. Should New York law ultimately be found to apply to the repo *616 transaction between AMC and Champlain, it is clear that the Treasury Notes were transferred to Champlain under N.Y.U.C.C. § 8-313(1)(d)(iii). However, as noted below, I do not reach this issue on the present motions and cross-motions.
5. Conclusions as to Delivery/Transfer
In conclusion, it is necessary to apply the above principles and conclusions relating to delivery/transfer to the individual AMC test cases at issue in the present motions and cross-motions.
a. Certificated and Book-Entry Securities in the AMC Clearing Account
Securities underlying the repo transactions in three of the five AMC test cases were located in the AMC clearing account on the filing date of the AMC reorganization proceeding: GNMA Pool # 69692 claimed by Worthen; GNMA Pool # 61337 claimed by Freeport; and U.S. Treasury Notes, 11.125%, claimed by Champlain. For the reasons set forth above, the certificated GNMA securities were not delivered or transferred to Worthen and Freeport under any of the subsections of § 8-313(1) of the N.J.U.C.C. and N.Y.U.C.C. For the same reasons, the Treasury Notes were not delivered or transferred to Champlain under any of the subsections of N.J.U.C.C. § 8-313(1) nor under subsections 8-313(1)(a), (1)(g) and (1)(d)(i) of the N.Y.U.C.C. Even if the Treasury Notes are ultimately determined to have been transferred to Champlain under N.Y.U.C.C. § 8-313(1)(d)(iii), it would not acquire its interest in the securities free of any adverse claims. See, N.Y.U.C.C. §§ 8-302(1)(c) and 8-313(2). Therefore, the extent of Champlain's entitlement to the securities or the proceeds of their sale is dependent, at least in part, upon a determination of the extent and validity of SPCSC's lien on securities in AMC's clearing account. The final resolution of Champlain's claim will therefore be deferred until after the validity of the SPCSC lien is decided.[5]
b. Certificated Securities in the AMC Safekeeping Account
Two of the five AMC test cases involve certificated securities which were located in the AMC safekeeping account on the filing date of the AMC Chapter 11 petition: GNMA Pool # 40566 claimed by Worthen and GNMA Pool # 57318 claimed by Lesney. AMC retained constructive possession of these securities and completed a legal delivery/transfer of the securities to Worthen and Lesney under either N.J.U.C.C. § 8-313(1)(c) or N.Y.U.C.C. § 8-313(1)(d)(i). If there are no adverse claims to the securities, Worthen and Lesney are entitled to immediate possession of the securities or the proceeds of their sale. If there are adverse claims, a future determination must be made as to whether Worthen and Lesney are bona fide purchasers of the securities and thereby acquired ownership of them free of any adverse claims. The record clearly reflects that they acquired the securities for value in good faith. Therefore, the only element of bona fide purchaser status which might be the subject of further inquiry is whether they acquired the securities without notice of adverse claims, if any.
c. Book-Entry Securities in the AMC Safekeeping Account
$175,000 of the U.S. Treasury Notes, 11.125%, claimed by Champlain remained in the AMC safekeeping account on the filing date of the AMC Chapter 11 petition. A determination as to whether these securities were delivered/transferred to Champlain under N.J.U.C.C. § 8-313(1)(c) or N.Y.U.C.C. § 8-313(1)(d)(i) is complicated somewhat by the fact that the securities are deemed to have been in the actual possession of SPNTCo. under applicable federal book-entry regulations, rather than SPCSC. See, eg., 31 C.F.R. 306.118(a). A question necessarily arises as to whether *617 AMC retained constructive possession of securities which are deemed to have been in the actual possession of a third party with whom AMC did not have a direct contractual relationship.
Common to the various federal regulations which govern the transfer of government and agency issued book-entry securities is the legal fiction that deems these securities to be in bearer-definitive (certificated) form "notwithstanding any provision of law to the contrary." Id. Among other goals in adopting the bearer-definitive fiction, the U.S. Treasury Department intended to preempt conflicting state law that could treat book-entry securities as "general intangibles" under Article 9 of the U.C.C.M. Hoey and L. Rassnick, "Automation of Government Securities Operations," 17 Jurimetrics Journal 176, 181. The bearer-definitive fiction thus promotes uniformity of treatment of certificated and uncertificated securities under Article 8 of the U.C.C. It would be inconsistent with this goal if, in the present case, different results with regard to delivery/transfer of securities under Article 8 would be reached merely because the underlying securities happened to be book-entry in form.
In any event, the fact that SPNTCo. is regarded to have been the custodian of the Treasury Notes purchased by Champlain does not undermine or detract from AMC's control or dominion over the securities. Computer entries in SPCSC's book-entry accounts at SPNTCo. reflected that certain securities were being held by SPCSC for the account of AMC. Guardino Aff., ś 18. These computer entries, however, did not distinguish between securities held in clearing or safekeeping accounts by SPCSC for AMC. Id. at ś 26. Nevertheless, there is no evidence that SPNTCo. had any rights whatsoever in the securities held in the SPCSC book-entry accounts for AMC. In particular, there is no evidence that SPNTCo. had a lien interest in the securities or had any right to use and benefit from the use of the securities. Although SPNTCo. was presumably accountable only to SPCSC and would only accept and respond to instructions from SPCSC, SPCSC itself was bound by its contractual obligations to AMC. Short of engaging in some manner of actionable misconduct, SPCSC could not initiate the transfer or delivery of book-entry securities in the AMC safekeeping account into or out of its book-entry accounts at SPNTCo. without first receiving instructions to do so from AMC.
I conclude that AMC maintained control and dominion over the Treasury Notes in its safekeeping account, and completed the delivery/transfer of these securities to Champlain under N.J.U.C.C. § 8-313(1)(c) and N.Y.U.C.C. § 8-313(1)(d)(i). As with Worthen's and Lesney's claims to certificated GNMA securities in the AMC safekeeping account, Champlain's entitlement to the Treasury Notes or the proceeds of their sale must await a determination as to whether there are any adverse claims to the Notes, and, if so, whether Champlain acquired the Notes as a bona fide purchaser.
E. Imposition of Constructive Trusts over Securities in the AMC Clearing Account
The Repo Committee argues that the test case repo participants are entitled to the securities located in the AMC clearing account or the proceeds of their sale regardless of whether these securities were delivered or transferred to them under applicable provisions of the N.J.U.C.C. or N.Y.U.C.C. In particular, the Repo Committee contends that SPCSC wrongfully placed or held these securities in the AMC clearing account and thereby prevented the legal delivery/transfer of the securities to the repo participants who purchased them from AMC. As a consequence, the Committee argues that these securities should be regarded as having been held by SPCSC in constructive trust for the repo participants.
The purpose of the constructive trust is prevention of unjust enrichment. Simonds v. Simonds, 45 N.Y.2d 233, 242, 408 N.Y.S.2d 359, 380 N.E.2d 189 (1978); D'Ippolito v. Castoro, 51 N.J. 584, 588, 242 A.2d 617 *618 (1968). Generally all that is required to impose a constructive trust is a finding that there was some wrongful act, usually, though not limited to, fraud, mistake, undue influence, or breach of a confidential relationship, which has resulted in a transfer of property. D'Ippolito, 51 N.J. at 589, 242 A.2d 617. Unjust enrichment, however, does not require the performance of a wrongful act by the one enriched. Simonds, 45 N.Y.2d at 242, 408 N.Y.S.2d 359, 380 N.E.2d 189. Therefore, "[a] constructive trust may arise . . . even though the acquisition of the property was not wrongful. It arises where the retention of the property would result in the unjust enrichment of the person retaining it." Scott on Trusts, § 462.2, p. 3417 (3d ed. 1967); Stewart v. Harris Structural Steel Co., Inc., 198 N.J.Super. 255, 266, 486 A.2d 1265 (A.D.1984); Simonds, 45 N.Y.2d at 242, 408 N.Y.S.2d 359, 380 N.E.2d 189.
There is no legal prohibition against applying the equitable doctrine of constructive trusts to commercial transactions which are otherwise governed by the U.C.C. Indeed, § 1-103 of both the N.J.U.C.C. and the N.Y.U.C.C. provides that "[u]nless displaced by the particular provisions of this Act, the provisions of law and equity . . . shall supplement its provisions." Section 1-103 gives examples of particular principles of law and equity which are preserved. Included among them are the equitable doctrines of fraud and mistake, which can form the basis for the imposition of constructive trusts.
The Repo Committee's argument in favor of the imposition of constructive trusts rests entirely on its assertion that SPCSC wrongfully failed to transfer certain securities from the AMC clearing account to its safekeeping account despite express instructions to do so, and wrongfully transferred securities from the safekeeping account to the clearing account without instructions from AMC to do so. AMC's confirmation of the sale of the GNMA security to Worthen contained delivery instructions noting that the security was to be held in AMC's safekeeping account. However, no written delivery instructions from AMC to SPCSC directing movement of the security from the clearing account to the safekeeping account have been located among AMC's or SPCSC's records, and the security remained in the clearing account until the filing of the AMC Chapter 11 petition. AMC's confirmation of the sale of the GNMA security to Freeport also contained delivery instructions to place the security in AMC's safekeeping account. AMC issued DEX instructions dated March 20, 1985 advising SPCSC to move the security into safekeeping. Although SPCSC apparently received the instruction, the security was not moved into safekeeping and remained in the AMC clearing account until the filing date. The customer confirmation of Champlain's purchase of the Treasury Notes similarly contained instructions for AMC to hold the securities in safekeeping. AMC instructed SPCSC by DEX instruction dated March 18, 1985 to move $510,000 of Treasury Notes into AMC's safekeeping account, and SPCSC accomplished the move on the same date. However, on March 22, 1985 and April 1, 1985, SPCSC moved $205,000 and $130,000, respectively, of the Treasury Notes from the safekeeping account to the clearing account where they remained until the filing date. Instructions from AMC authorizing these moves have not been located among the records of AMC or SPCSC. As of the filing date, only $175,000 of the Treasury Notes remained in the AMC safekeeping account.
There is no question that Worthen, Freeport and Champlain would have obtained a legal delivery or transfer of the securities had they been held in the AMC safekeeping account, as they were apparently intended to have been. Furthermore, if SPCSC is permitted to enforce its security interest against securities which were not supposed to have been held in the AMC clearing account subject to SPCSC's lien, there is no question that SPCSC would be enriched thereby. However, imposition of constructive trusts would be appropriate only if SPCSC's failure to move securities into safekeeping or retain securities in safekeeping was unjustified under the circumstances. *619 See, Simonds, 45 N.Y.2d at 242, 408 N.Y.S.2d 359, 380 N.E.2d 189 ("What is required, generally, is that a party hold property `under such circumstances that in equity and good conscience he ought not to retain it'").
Although the facts recited above are suggestive of possible negligence or other wrongdoing by SPCSC, the record as it stands does not permit such conclusions. For example, the record does not reflect the reasons for SPCSC's failure to comply with instructions from AMC to transfer the GNMA securities claimed by Worthen and Freeport into safekeeping. Nor does the record establish that AMC did not instruct SPCSC to transfer the Treasury Notes claimed by Champlain from safekeeping into clearing.
Issues relating to alleged wrongdoing by SPCSC are the subject of ongoing discovery in the pending lawsuit brought by the AMC Trustee against SPCSC. The Repo Committee is actively participating in this discovery, and I conclude that the resolution of its constructive trust claims must await further factual development of the record.
VI. CONCLUSIONS
The motion of the BBS, Inc. Trustee for summary judgment declaring that: (1) the repos and reverse repos involved in the test case transactions are collateralized loans and not purchases and sales is denied; (2) repo participants and reverse repo participants in the test cases are not customers of BBS, Inc. within the terms of SIPA is denied; (3) repo participants who did not take actual possession of the underlying securities neither perfected their interests in the securities under New Jersey law nor acquired any interest under New York law is denied as moot; and (4) the Trustee's rights to the securities underlying the reverse repo transactions and the proceeds remitted to him pursuant to 11 U.S.C. § 559 are superior to those of the reverse repo participants is granted for the reason that the reverse repo participants are "customers" under SIPA whose claims are subject to the SIPA distribution scheme.
The cross-motion of the Repo Committee for summary judgment declaring that repo participants are "customers" of BBS, Inc. under SIPA is granted. The motion of Harrisburg for summary judgment on this same issue is also granted.
The cross-motion of the Repo Committee for summary judgment declaring that repo participants have effectuated transfer or delivery of the securities underlying the test case repo transactions is: (1) granted as to the certificated and book-entry securities which were located in the AMC safekeeping account on the filing date of the Chapter 11 petition; (2) denied as to the certificated GNMA securities which were located in the AMC clearing account on the filing date; (3) denied without prejudice as to the book-entry securities claimed by Champlain which were located in the AMC clearing account on the filing date; and (4) denied as moot as to the securities underlying the BBS, Inc. test case repo transactions. The motion of the Repo Committee for summary judgment imposing a constructive trust on the certificated GNMA security and book-entry Treasury Notes claimed by Freeport and Champlain, respectively, which were located in the clearing account on the filing date is denied without prejudice.
The motion of the AMC Trustee for summary judgment authorizing the Trustee to reject the Reverse Repo Agreements is denied without prejudice. Following limited discovery on the issue of whether the estate will benefit from rejection of the Reverse Repo Agreements, the Trustee may separately apply for an order authorizing rejection of the Agreements. Any future application in this regard should be factually supported by affidavit incorporating any relevant documentation.
The motion of the AMC Trustee for summary judgment declaring that the repo and reverse repo participants who are parties to the present test cases are general creditors of the estate and adjudging that the securities underlying the test case repo and reverse *620 repo transactions are property of the estate is denied as to Worthen, Freeport and Champlain with regard to the securities underlying their repo transactions with AMC which were located in the AMC safekeeping account on the filing date of the Chapter 11 petition. Insofar as the issues relating to the imposition of constructive trusts and rejection of the Reverse Repo Agreements remain unsettled, the motion of the AMC Trustee is denied without prejudice as to the remaining parties and securities.
I request that counsel for the Repo Committee submit an order in each of the above-captioned adversary proceedings duly reflecting the conclusions contained in this opinion.
NOTES
[1] The information in the following discussion of the Federal Reserve book entry system is drawn primarily from affidavits submitted in support of a memorandum of the U.S. Treasury Department and the FRBNY in the case of Wichita Federal Savings & Loan Association v. Comark, Civil Action No. 82-4703 (S.D.N.Y.), copies of which are attached as Exhibit B to the FRBNY Amicus Brief.
[2] The Reverse Repo Committee does not contend that the reverse repo agreements were intended to serve as security agreements. Indeed, under § 9-203(1) of the U.C.C., a writing is not necessary to create an enforceable security interest if the collateral is in the possession of the secured party. In each of the test case reverse repo transactions, possession of the underlying securities was transferred to BBS, Inc. or AMC.
[3] There are significant differences between the New Jersey and New York versions of the U.C.C. However, it is unnecessary to engage in a choice of law analysis to determine which version should be applied to the AMC test case repo transactions because the outcome of the present motions and cross-motions is the same under either version. To the extent that the differences between the two U.C.C. versions might ultimately affect the interests of particular parties to the AMC adversary proceeding, these differences will be duly noted.
[4] The Repo Committee contends that the question of whether AMC had constructive possession of securities in the SPCSC clearing account cannot and should not be decided in the context of the present motions and cross-motions. The Committee asserts that the resolution of this question is dependent upon a determination of whether SPCSC's asserted lien on clearing account securities is valid and enforceable, an issue which was explicitly excluded from consideration in this first round of summary judgment motions. The Repo Committee argues that if the SPCSC lien is declared to be invalid then the provisions of the Clearing Agreement which were intended to preserve and protect the lien would be a nullity. As a result, the restrictions which such provisions placed on AMC's control and dominion over the clearing account securities would have to be treated as if they never existed.

The Committee does not cite to any legal authority which would require such a far-reaching result, and I find that its argument overstates the impact which a finding of invalidity would have on the issue of constructive possession. If the lien is ultimately declared to be invalid because of alleged misconduct or bad faith on the part of SPCSC, then SPCSC would almost certainly lose the right to enforce its security interest in the clearing account securities. See, e.g., Hillman, McDonnell & Nickles, Common Law and Equity Under the Uniform Commercial Code, p. 24-63 (1985). This result, however, does not alter the fact that during the operational life of the clearing Agreement AMC was subject to contractual restrictions which expressly limited its ability to exercise control and dominion over clearing account securities. These restrictions, such as SPCSC's right to contravene AMC's delivery instructions, were not contingent upon a determination that SPCSC had a valid lien on the securities.
Furthermore, as a general rule, breach of an agreement by one party does not confer upon the other party rights greater than those which it would have had in the absence of the breach. AMC voluntarily relinquished control and dominion over the clearing account securities at the outset of its relationship with SPCSC, and subsequent conduct of SPCSC which might serve to defeat its security interest in the securities does not change this fact.
Thus, as a factual matter, AMC did not have constructive possession of the securities in the clearing account regardless of whether the SPCSC lien is ultimately determined as a matter of law or equity to be invalid.
[5] The choice of law determination as to whether § 8-313(1)(d)(iii) of the N.Y.U.C.C. is applicable to Champlain's claim to the Treasury Notes will also be deferred.